Consolidated Case Nos. 23-1687 & 23-1688

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

United States of America,
*Plaintiff-Appellee,*

v.

Dae Yong Lee and 940 Hill, LLC,
*Defendant-Appellants.*

_____

Consolidated Appeals from the United States District Court,
Central District of California, Case Nos. 2:20-cr-326-JFW-5 & -6,
Hon. John F. Walter

_____

### Appellants' Joint Opening Brief

_____


John L. Littrell, Cal. State Bar No. 221601
jlittrell@bklwlaw.com
Ryan V. Fraser, Cal. State Bar No. 272196
rfraser@bklwlaw.com
Bienert Katzman Littrell Williams LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700
Facsimile: (949) 369-3701

Attorneys for Defendant-Appellants
Dae Yong Lee and 940 Hill, LLC

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ..................................................................... 1

II.   STATEMENT OF JURISDICTION ..................................... 3

III.  CUSTODY STATUS ............................................................. 4

IV.  ISSUES PRESENTED .......................................................... 4

     A.   Prior restraint of First Amendment rights ................... 4

     B.   Wrongly rejected *Batson* challenge ............................... 4

     C.   Erroneous exclusion of critical exculpatory evidence.... 5

     D.   Jury-instruction errors ..................................................... 6

     E.   Cumulative error ................................................................ 7

     F.   Procedurally defective imposition of the fine ................ 7

V.    STATEMENT OF THE CASE ................................................. 8

     A.   Indictment ......................................................................... 8

     B.   Pretrial proceedings ....................................................... 10

     C.   Trial ................................................................................... 11

          1.   Jury instructions and proposed verdict forms.... 12

          2.   Jury selection ...................................................... 13

          3.   Opening statements ........................................... 15

          4.   Justin Kim recordings and testimony ............... 16

          5.   Closing arguments and rebuttal......................... 17

          6.   Verdict ................................................................. 19

     D.   Sentencing ....................................................................... 19

VI.   SUMMARY OF ARGUMENT ................................................ 21

VII.  ARGUMENT ....................................................................... 24

    A.   The categorical ban on passively viewing prospective jurors' public social-media profiles violated the First Amendment and necessitates remand ......................... 24

        1.   The social-media ban was per se error because there were no supporting factual findings. ........ 25

        2.   Banning passively researching prospective jurors' public social-media profiles was unsupportable in this case. ........................................................... 27

        3.   This error entitles the defendants to a new trial. 31

    B.   The complete failure to perform step-three analysis of Lee's *Batson* challenge necessitates remand............... 36

        1.   The three steps of *Batson* analysis ................... 37

        2.   The district court erred at step three. ............... 39

        3.   By a preponderance of the available evidence, race appears to have been a substantial motivating factor for the challenged strike. ........ 40

    C.   The district court erred by excluding admissible evidence Lee did not know the money he gave to Kim would be used to bribe Huizar. .................................... 43

        1.   Lee's nonassertive *questions* about what Kim did with the money were not hearsay ....................... 43

        2.   Lee's statements referencing CREED or the "union" were not offered for their truth .............. 46

        3.   Exhibits 118A and 118B were reliable, crucial to the defense, and necessary to correct the government's misleading presentation ............... 46

D.   Jury Instructions...............................................49

    1.   The Count Five instruction allowed the jury to convict Mr. Lee without proof of an "official act" as required by *McDonnell*. ..................................49

    2.   The Count Twenty-Five instruction allowed a conviction without a bribe in connection with *government* business. ..........................................53

    3.   The Count Five and Twenty-Five convictions must be vacated and a new trial ordered to remedy these instructional errors. ...................55

E.   The trial errors created prejudicial synergy, supporting reversal for cumulative error. ......................................55

F.   The scantily explained $750,000 statutory-maximum fine on Lee—triple the high end of the correct Guidelines range—cannot stand because the district court committed several procedural errors. ................56

    1.   Failure to correctly calculate the applicable Guidelines range for the fine ...........................57

    2.   Failure to explain the fine amount in proportion to the Guidelines range.................................58

    3.   Failure to address significant mitigating factors..60

VIII. CONCLUSION.............................................. .....61

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Alexander v. United States,*
    509 U.S. 544 (1993) ........................................................................ 27

*Batson v. Kentucky,*
    476 U.S. 79 (1986) ................................................................. passim

*Boyd v. Newland,*
    467 F.3d 1139 (9th Cir. 2006) ..................................................... 40

*Chapman v. California,*
    386 U.S. 18 (1967) ........................................................................ 35

*Cook v. LaMarque,*
    593 F.3d 810 (9th Cir. 2010) ......................................... 37, 40, 42

*Crittenden v. Chappell,*
    804 F.3d 998 (9th Cir. 2015) ....................................................... 43

*Daily Herald Co. v. Munro,*
    838 F.2d 380 (9th Cir. 1988) ...................................................... 25

*Domingo v. New England Fish Co.,*
    727 F.2d 1429 (9th Cir.), *modified*, 742 F.2d 520 (9th Cir. 1984) . 26

*Flowers v. Mississippi,*
    139 S. Ct. 2228 (2019) ................................................................. 36

*Gall v. United States,*
    552 U.S. 38 (2007) ........................................................................ 58

*Gentile v. State Bar of Nev.,*
    501 U.S. 1030 (1991) ................................................................... 25

*Green v. LaMarque,*
    532 F.3d 1028 (9th Cir. 2008) ......................................... 37, 38, 39

iv

*Griffin v. United States,*
    502 U.S. 46 (1991) ........................................................................ 55

*Hernandez v. New York,*
    500 U.S. 352 (1991) ...................................................................... 39

*Jamerson v. Runnels,*
    713 F.3d 1218 (9th Cir. 2013) .................................................... 43

*Johansen ex rel. N.L.R.B. v. San Diego Cnty. Dist. Council of Carpenters of United Bhd. of Carpenters & Joiners of Am., AFL-CIO,*
    745 F.2d 1289 (9th Cir. 1984) .................................................... 26

*Kesser v. Cambra,*
    465 F.3d 351 (9th Cir. 2006) ...................................................... 42

*Levine v. U.S. Dist. Ct. for Cent. Dist. of Cal.,*
    764 F.2d 590 (9th Cir. 1985) ...................................................... 28

*Marquez v. Bd. of Cnty. Comm'rs Eddy Cnty.,*
    No. CIV 11-0838 JAP/KBM, 2015 WL 13638613 (D.N.M. Jan. 13, 2015) ........................................................................................ 29

*McDonnell v. United States,*
    579 U.S. 550 (2016) ...................................................................... 50

*Miller-El v. Cockrell,*
    537 U.S. 322 (2003) ...................................................................... 37

*Miller-El v. Dretke,*
    545 U.S. 231 (2005) ................................................................ 40, 42

*Myron v. Terhune,*
    225 Fed. App'x 434 (9th Cir. 2007) .......................................... 25

*Neder v. United States,*
    527 U.S. 1 (1999) .................................................................... 31, 32

*Nguyen v. Frauenheim,*
    45 F.4th 1094 (9th Cir. 2022) .................................................... 41

*Oracle America, Inc. v. Google, Inc.*,
   172 F. Supp. 3d 1100 (N.D. Cal. 2016) ......................................... 31

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*,
   961 F.3d 1062 (9th Cir. 2020) ...................................................... 30

*Packingham v. North Carolina*,
   582 U.S. 98 (2017) ............................................................... 27, 34

*Phillips v. U.S. Customs & Border Prot.*,
   74 F.4th 986 (9th Cir. 2023) ........................................................ 29

*Press-Enter. Co. v. Superior Ct. of Cal., Riverside Cnty.*,
   464 U.S. 501 (1984) .................................................................... 26

*Se. Promotions, Ltd. v. Conrad*,
   420 U.S. 546 (1975) .................................................................... 28

*Shirley v. Yates*,
   807 F.3d 1090 (9th Cir. 2015) ...................................................... 39

*Swain v. Alabama*,
   380 U.S. 202 (1965) .................................................................... 32

*Thunder Studios, Inc. v. Kazal*,
   13 F.4th 736 (9th Cir. 2021) ........................................................ 28

*United States v. Alvarez-Ulloa*,
   784 F.3d 558 (9th. Cir. 2015) ........................................... 36, 39, 40

*United States v. Antar*,
    38 F.3d 1348 (3d Cir. 1994) ................................................. 26, 27

*United States v. Bachmeier*,
   8 F.4th 1059 (9th Cir. 2021) ........................................................ 55

*United States v. Barona*,
   56 F.3d 1087 (9th Cir. 1995) ........................................................ 55

*United States v. Becerra*,
   939 F.3d 995 (9th Cir. 2019) ........................................................ 33

*United States v. Bushyhead,*
    270 F.3d 905 (9th Cir. 2001) .................................................. 35, 36

*United States v. Carty,*
    520 F.3d 984 (9th Cir. 2008) (en banc) ........................ 57, 58, 60, 61

*United States v. Changco,*
    1 F.3d 837 (9th Cir. 1993) ........................................................... 41

*United States v. Frederick,*
    78 F.3d 1370 (9th Cir. 1996) ...................................................... 56

*United States v. Garrido,*
    713 F.3d 985 (9th Cir. 2013) ...................................................... 54

*United States v. Inzunza,*
    638 F.3d 1006 (9th Cir. 2011) .................................................... 55

*United States v. Lindberg,*
    39 F.4th 151 (4th Cir. 2022) ...................................................... 54

*United States v. Lopez,*
    4 F.4th 706 (9th Cir. 2021) ........................................... 43, 46, 47, 48

*United States v. Lopez-Alvarez,*
    970 F.2d 583 (9th Cir. 1992) ................................................ 46, 47

*United States v. Martinez,*
    994 F.3d 1 (1st Cir. 2021) ........................................................... 54

*United States v. Munoz-Camarena,*
    631 F.3d 1028 (9th Cir. 2011) .................................................... 60

*United States v. Ng Lap Seng,*
    934 F.3d 110 (2d Cir. 2019) ....................................................... 54

*United States v. Porter,*
    886 F.3d 562 (6th Cir. 2018) ...................................................... 54

*United States v. Renzi,*
    769 F.3d 731 (9th Cir. 2014) ...................................................... 49

*United States v. Roberson,*
998 F.3d 1237 (11th Cir. 2021) ...................................................54

*United States v. Sanchez,*
74 F.3d 562 (5th Cir. 1996) ......................................................35

*United States v. Torres,*
794 F.3d 1053 (9th Cir. 2015) ...................................................45

*United States v. Town of Colorado City,*
935 F.3d 804 (9th Cir. 2019) ....................................................43

*United States v. Velarde-Gomez,*
269 F.3d 1023 (9th Cir. 2001) ...................................................35

*United States v. Whitfield,*
590 F.3d 325 (5th Cir. 2009) ....................................................53

*Va. State Bd. of Pharmacy v. Va. Citizen's Consumer Council, Inc.,*
425 U.S. 748 (1976) ...............................................................28

*Walker v. City of Birmingham,*
388 U.S. 307 (1967) ...............................................................34

*Weaver v. Massachusetts,*
582 U.S. 286 (2017) ..........................................31, 32, 33, 34, 35

## Statutes and Rules

Fed. R. App. P. 4(b)(1)(A)(i).......................................................3

Fed. R. Crim. P. 24(b)..............................................................32

## Other

John G. Browning, *Voir Dire Becomes Voir Google: Ethical Concerns of 21st Century Jury Selection* (Am. Bar Ass'n Apr. 25, 2019), https://www.americanbar.org/groups/tort_ trial_insurance_practice/publications/the_brief/2016_17/winter/voi r_dire_becomes_voir_google_ethical_concerns_of_21st_century_jur y_selection. ........................................................................30

Erwin Chemerinsky, *Silence Is Not Golden: Protecting Lawyer Speech Under the First Amendment*, 47 Emory L.J. 859, 867 (1998) ....... 34

# I.    INTRODUCTION

Because jury selection in this case was infected by constitutional errors, this Court must reverse and remand for a new trial.

First, without reasoning, the district court restrained the defendants and their attorneys from passively reviewing venirepersons' public social-media profiles to inform cause challenges and peremptory strikes.  This structural error violated the defendants' and their attorneys' First Amendment rights and deprived them of a fair trial.

Second, again without supporting analysis, the district court overruled a race-based *Batson* challenge to the government's strike of the last remaining Asian venireperson, even though the prosecutor's purported reasons for the strike and denial of recognizing the venireperson was Asian were pretextual.

This appeal also seeks to redress legal errors that distorted the jury's perception of the facts and the essential nature of the charges.

The government's core contention at trial was that Defendant David Lee paid hundreds of thousands of dollars via his consultant Justin Kim, as a bribe to former Los Angeles City Councilman Jose Huizar to secure his support for a real-estate development project at

1

940 Hill Street.  The defendants disputed the factual premise that Lee intended his payment to Kim as a bribe to Huizar, and the legal premise that Huizar's informal support for the project could be an "official act" sufficient to satisfy the elements of either honest-services fraud or federal-funds bribery.

Evidence relating to Lee's knowledge of what the payment to Kim was for and to whom it was intended was therefore crucial to both the government and the defense.  Surreptitiously recorded conversations between Lee and Kim supported Lee's defense that he did not know or intend that the money he paid to Kim would be used to bribe Huizar. But because of erroneous hearsay rulings by the district court, the government was able to present only the portions of those recordings that supported its misleading and one-sided narrative, while crucial portions of the recording that supported the defense theory were excluded. Compounding the error, the government argued in closing that the defense, not the government, was misleading the jury.

It was equally crucial that the jury be properly instructed on the "official act" required for a conviction of both Counts Five and Twenty-Five.  Contrary to the Supreme Court and relevant statutes' contrary

guidance, the instructions given to the jury permitted them to convict even in the absence of proof that payment was given in exchange for an "official act" or in connection with *government business*, as those phrases must be construed to avoid constitutional problems.

Finally, the district court committed procedural error when it imposed a fine far in excess of the maximum provided for by the Sentencing Guidelines without providing any meaningful reasoning or considering evidence presented by the defense in mitigation.

## II.   STATEMENT OF JURISDICTION

Lee and 940 Hill appeal their convictions of one count each of honest-services wire fraud (18 U.S.C. §§ 1343 and 1346), bribery concerning programs receiving federal funds (18 U.S.C. § 666(a)(2)), and altering records in a federal investigation (18 U.S.C. § 1519).  Lee also appeals his resulting criminal fine.  The district court had original jurisdiction under 18 U.S.C. § 3231 and entered judgments against Lee and 940 Hill on July 21, 2023.  1-ER-2, 1-ER-8.

Those judgments are final decisions appealable under 28 U.S.C. § 1291.  Lee and 940 Hill filed timely notices of appeal on August 3, 2023.  4-ER-1046, 5-ER-1055; *see* Fed. R. App. P. 4(b)(1)(A)(i).

## III. CUSTODY STATUS

Lee began serving a 72-month prison sentence on January 2, 2024. A projected release date is not yet available.

## IV. ISSUES PRESENTED

### A. Prior restraint of First Amendment rights

Prior restraint of First Amendment activity by trial participants is justified only where the court makes supporting factual findings that the restrained activity poses a clear and present danger or serious and imminent threat to a protected competing interest, the restraint is narrowly drawn, and no less restrictive alternative exists. Without considering any of these requirements or making factual findings to support its decision, the district court banned the defense from the recognized First Amendment activity of passively reviewing public social-media profiles. Did this satisfy the First Amendment?

### B. Wrongly rejected *Batson* challenge

1. *Skipping analysis in* Batson *step three.* To complete step three of ruling on a *Batson* challenge, a trial judge must analyze such circumstantial and direct evidence of intent as may be available. Here, the judge overruled a race-based *Batson* challenge to the prosecutor's strike of the sole remaining Asian venireperson without discussing any

4

evidence, even though the prosecutor had accepted non-Asians who shared the traits cited by the prosecutor in support of the strike. Did the judge err?

2. *Discriminatory strike under* Batson. A prosecutor's proffered reason for a peremptory strike was likely pretextual if the same reason applied to a comparable juror of a different race whom the prosecutor chose not to strike. Here, each characteristic cited by the prosecutor to explain his challenged strike was shared by a comparable non-Asian he chose not to strike. He also conspicuously denied recognizing that the Thai-surnamed, Asian-looking venireperson was Asian. Do the prosecutor's reasons appear pretextual?

## C. Erroneous exclusion of critical exculpatory evidence

1. *Hearsay error.* The hearsay rule excludes only intentional assertions of fact offered to prove their truth. In the portions of a surreptitious recording the district court excluded, Lee asked Kim questions intending to find out how, in fact, Kim had used the money Lee had given him. Did the government carry its burden to show Lee intended his questions to Kim as assertions of fact?

5

2. *Rule-of-completeness error*.  The rule of completeness calls for admitting parts of a recorded statement, even if hearsay, to correct a misleading impression left by excerpts from the same recording introduced by an opponent.  After the government introduced portions of the surreptitious recording that created a misleading impression Lee knew the money given to Kim was a bribe to Huizar, should Lee have been permitted to introduce other parts of the same recording reflecting that he did not know what Kim had done with his money?

### D.  Jury-instruction errors

1. *Official act*.  The only conduct that can qualify as an "official act" for the purpose of honest-services fraud is the conduct of a public official with respect to a specific governmental decision.  The district court's "official act" instruction allowed the jury to convict Lee based on pressure applied on a *private* official to take a *nongovernmental* decision.  Did the instruction correctly define an "official act"?

2. *Federal-funds bribery*.  The benefit given in committing federal-funds bribery must be given in connection with government business, which, to avoid constitutional concerns, must be construed to mean an official act.  The district court's instruction defined federal-federal funds

6

bribery to include a payment given to influence action by a private party that would not amount to an official act. Did the instruction correctly define federal-funds bribery?

### E. Cumulative error

The government must prove constitutional errors harmless beyond reasonable doubt, and excluding critical exculpatory evidence is a constitutional error. Here, the government's case was circumstantial and depended on the credibility of a confessed criminal and liar whom the government was providing benefits. Can the government prove the evidentiary and instructional errors described in the foregoing issues harmless beyond reasonable doubt even cumulatively?

### F. Procedurally defective imposition of the fine

Sentencing courts must correctly calculate the Guidelines range, explain the extent of any Guidelines variance in proportion to the magnitude of the variance, consider Guidelines-enumerated factors bearing on the amount of a fine, and address any substantial arguments in mitigation. In imposing the statutory-maximum fine at more than double the high end of the Guidelines range, the district court did none of these things. Was imposition of the fine procedurally erroneous?

## V.   STATEMENT OF THE CASE

### A.   Indictment

The Superseding Indictment ("SI") alleged that David Lee enlisted the help of Justin Kim, a real estate appraiser and fundraiser for former Los Angeles City Councilman Jose Huizar, to deal with an appeal lodged against Lee's development proposal for 940 Hill Street by a nongovernmental labor organization called "CREED LA," which the parties have sometimes called a "union."  *See* 4-ER-937 (Overt Act ("OA") 85).  According to the SI, Huizar indicated to Kim, through Huizar's assistant, George Esparza, that Huizar would require a financial benefit in exchange for his help.  4-ER-938 (OA 89).

Esparza and Kim negotiated the amount, which, in their initial discussions, ranged from $1.2 to $1.4 million.  4-ER-939 (OA 94).  Ultimately, these two settled on $500,000 cash.  Lee did not participate in any of these meetings between Kim and Esparza.

The SI alleged that on March 14, 2017, Lee gave Kim cash for dealing with the appeal.  4-ER-941 (OA 105).  That same day, Kim delivered approximately $400,000 to Esparza and kept some for

8

himself. 4-ER-941–42 (OA 107, 109). In July 2017, Lee gave Kim an additional $100,000, which Kim kept for himself. 4-ER-942 (OA 110).

Count Five charged Lee and 940 Hill with violating 18 U.S.C. §§ 1343 and 1346 by an honest-services wire-fraud scheme based on the allegation that Lee gave cash to Kim to bribe Huizar and/or Esparza to make the CREED LA appeal go away, either by voting "on projects in various City committees, including the [Planning and Land Use Management ('PLUM')] Committee, and City Council," or by "pressuring" CREED LA to drop its appeal. 4-ER-1008–11.

Count Twenty-Five charged Lee and 940 Hill with a violation of 18 U.S.C. § 666(a)(2), bribery concerning programs receiving federal funds, based on a similar theory and the same alleged conduct. *See* 4-ER-1021. It accused Lee of offering, through Kim, a $500,000 payment to Huizar and Esparza, intending to influence and reward them in connection with (1) pressuring CREED to dismiss its appeal against the 940 Hill Project, and (2) voting to deny the same appeal in the PLUM committee. *See id.*

Count Thirty-Eight charged Lee and 940 Hill with violating 18 U.S.C. § 1519 by obstructing the government's investigation by altering

9

records for the year 2018 to falsely record a $500,000 payment as a legitimate expenditure incurred in 2018 for resolving the CREED appeal, as opposed to a 2017 bribe. 4-ER-1031.

## B. Pretrial proceedings

By pretrial motions to strike surplusage, the defendants attacked the government's position that it could satisfy the "official act" required by *McDonnell v. United States*, 579 U.S. 550 (2016), to support the Count Five bribery-related honest-services wire-fraud charge or the "government business" element of the Count Twenty-Five federal-funds-bribery charge with evidence of Huizar or Esparza merely pressuring CREED to withdraw its own appeal. 4-ER-862, 4-ER-884.

This was no mere technicality because, as the government announced at a pretrial hearing, its "theory of the case [was] that Jose Huizar used his official position to pressure the Labor Organization to drop its appeal." 4-ER-821. Hearing this, the district court asked the prosecutor, "What is the official act?" *Id*. She responded:

> The official act, Your Honor, was to resolve this appeal using whatever means were necessary. ... [Huizar] also had the power as a sitting councilman who ultimately would vote on this appeal to get this appeal dismissed in other ways which is how he did it behind closed doors and in a way that wasn't immediately obvious to the public *which was to pressure the*

10

> *lobbyist of this Labor Organization to convince the Labor*
> *Organization to drop the appeal.*

*Id.* (emphasis added).  The government also confirmed in a pretrial

letter to defense counsel that the (only) official acts relevant to Count

Five were the same acts alleged in Count Twenty-Five: i.e.,

"(1) pressuring [CREED LA] to dismiss its appeal against the 940 Hill

Project and (2) voting to deny [CREED LA]'s appeal against the 940 Hill

Project in the PLUM Committee."  4-ER-905.

The district court denied the defendants' motions to strike

surplusage, reasoning that although "negotiating and exerting pressure

on labor unions to resolve issues on projects does not typically, without

more, constitute an official act," the SI alleged evidence that Huizar had

agreed to the official act of opposing CREED's appeal in the PLUM

Committee.  4-ER-797.  Turning to federal-funds bribery and finding

the issue unresolved by any controlling circuit authority, the district

court held that § 666(a)(2) does not require an official act.  4-ER-798–

805.

## C.    Trial

The trial began on June 14, 2022.  Two core disputes were:

(1) whether Lee gave cash to Kim intending him to give it to Huizar in

exchange for voting down CREED's appeal in the city council or informally pressuring CREED to withdraw its appeal and (2) whether the latter, if proven, would constitute an official act.

### 1. Jury instructions and proposed verdict forms

Lee and 940 Hill requested jury instructions on Counts Five and Twenty-Five and their theory of defense that would have foreclosed a conviction based merely on pressuring CREED to withdraw its appeal. 1-ER-169–71, 174–78. These instruction requests also sought to limit the government to the putative acts identified as being at issue in the April 8, 2021, disclosure letter. *See* 4-ER-905. As a fallback, Lee and 940 Hill also asked the court, if it would not give those instructions, at least to provide verdict forms requiring the jury to specify, in case of a guilty verdict, "what specific acts by Jose Huizar and/or George Esparza were promised in exchange for the alleged bribe." 4-ER-782.

The government insisted it could obtain a conviction based merely on Huizar pressuring CREED to withdraw its own appeal. *See* 4-ER-777–81.

The court denied the defense requests, adopting the government's position with only minor changes.  1-ER-111–15; 3-ER-741–48 ; *see also* 1-ER-149–51, 1-ER-151–53, 1-ER-159, 1-ER-161.

### 2.    **Jury selection**

Just before jury selection, the government asked the district court to prohibit "social media and Open Source research on proposed jurors," stating "some Courts expressly disallow that in jury selection" and "we believe it's improper" as the only supporting grounds.  Alternatively, the government requested "express permission" to do its own social-media research if the court would allow it by the defense.  1-ER-120.  Defense counsel confirmed their intention to perform online research on jurors, contending that "passive review of information, not ... making contact and not trying to get into any private social media, [would be] perfectly allowable and [not] violate any rules of the Court or of the Bar."  1-ER-121.  Without further discussion or explanation, the district court stated: "Well, I wish that you would have raised that before. I'm not going to –... allow it for either side."  *Id*.

Jury selection lasted only 2 hours and 16 minutes.  6-ER-1236–1337.  It was conducted exclusively by the district court.  A written

13

questionnaire directed venirepersons to state their name; occupation; educational degree or training; county of residence; marital and parental status; if married, spouse's occupation; prior jury service; and to give notice if any special circumstances applied, such as having been involved as a witness, victim, or defendant in a criminal case. *See* 6-ER-1235; *e.g.*, 6-ER-1238 (voir dire of juror 1). The attorneys were not allowed any follow-up questions. 4-ER-788.

Lee, a Korean-American, was ultimately tried by a jury that included no Asian jurors. Defense counsel objected under *Batson* to the government's peremptory strike of the last remaining Asian venireperson, alternate juror number 2 at the time, who appeared Asian and had a Thai family name. 1-ER-126, 128–29. He was an undergraduate computer-science student, working part-time as a grader for his school, single, with no kids, having never before served on a jury, with no special circumstances to note in response to the court's longer questionnaire. 1-ER-126–27. When the prosecutor struck this young man, defense counsel noted "there appear[ed] to be nothing other than the fact that he was Asian" to explain the strike. 1-ER-129.

Without explanation, the prosecutor "disagree[d] that that juror was Asian." *Id*. The prosecutor claimed the following reasons for the strike: "he is a young student, provided very little information. He's a computer scientist, studying computer science. And we are typically uncertain of how computer scientists and college students will react to deliberating with other jurors." *Id*. Without analyzing the circumstances of the strike, and without any other factual findings, the court "f[ound] … that the Government struck that witness [*sic*] for a nondiscriminatory reason." *Id*.

### 3.   Opening statements

In opening, the government said Lee and 940 Hill provided cash to Kim "believing and intending [it] to go to Huizar," 6-ER-1363, that the defendants expected Huizar and Esparza would "help" and "act on their behalf," and implied that would suffice for a conviction:

> [W]hat did the defendants expect in return for [their cash]? The Government will prove that they expected that Jose Huizar would help them, that he and his special assistant, George Esparza, who was also a public servant, would act on their behalf, not on behalf of the citizens of Los Angeles and not on behalf of the City but on their behalf in return for that cash.

6-ER-1348. The government suggested the same conduct and evidence would satisfy both Count Five and Count Twenty-Five. *See* 6-ER-1349, 6-ER-1361, 6-ER-1362.

The defense countered:

> The reason you're here and what we're going to ask you to focus on is whether Mr. Lee knew that Justin Kim was dragging him into this secret world, *not what Justin Kim knew or George Esparza knew or Jose Huizar knew. Did Mr. Lee intend to pay a bribe? Did Mr. Lee know how Justin Kim was going to use his money?*

6-ER-1372 (emphasis added).

### 4. Justin Kim recordings and testimony

Kim testified as a key cooperating witness for the government, having surreptitiously recorded two conversations with Lee for the government. *See* 7-ER-1583, 11-ER-2572–2755, 12-ER-2792–2971. The government selectively introduced into evidence excerpts of those recordings. *See* 7-ER-1586–88; 13-ER-3299, 13-ER-3303, 13-ER-3305, 13-ER-3307, 13-ER-3309, 13-ER-3312, 13-ER-3315. Though transcripts provided English translations from the original spoken Korean, Kim testified to his interpretation of Lee's remarks. According to Kim, Lee admitted to a "bribery" he committed with Kim and "calm[ly]" encouraged Kim to "blame" Huizar for it. *E.g.*, 11-ER-2745:24–2746:8

16

(Kim testifying that Lee meant in 13-ER-3299 that they had "committed a bribery"), 11-ER-2748:13–20 (similar); *see also id.* 11-ER-2750:14–2751:5 (interpreting 13-ER-3309), 11-ER-2751:20–2752:4 (same); 11-ER-2753:4–23 (interpreting 13-ER-3312), 11-ER-2754 (same), 11-ER-2755 (interpreting 13-ER-3315).

Meanwhile, the district court denied the defense's request to admit Exhibits 118A (13-ER-3292) and 118B (13-ER-3296), which were contrary excerpts from one of the recordings in which Mr. Lee showed a lack of understanding of what Kim had done with the money Lee gave him.  1-ER-134–42 (court's ruling); 3-ER-749 (defense briefing).  For example, in Exhibit 118A, Mr. Lee said to Kim "But you said [Huizar] didn't receive the money," 13-ER-3294, and went on to ask Kim two non-assertive questions: "Then who took the money?" and "How much was given to the union?"  13-ER-3295.

### 5.    Closing arguments and rebuttal

In closing, the government emphasized the pressuring-CREED theory and its curated clips from the surreptitious recordings.  13-ER-3133:20–3135:14, 13-ER-3145:23–3147:4.

17

The defense responded there was "no credible evidence that Mr. Lee knew that the money he paid to Justin Kim was going to Jose Huizar or George Esparza." 13-ER-3149. The government's case was based merely on Kim's word that Lee intended to pay a bribe. 13-ER-3149–51. Kim, meanwhile, was a lying thief, *cf.* 12-ER-2799, whose purported opinion couldn't be separated from his "sweetheart deal" with the government, which allowed him to keep "hundreds of thousands of dollars in criminal proceeds ... tax free." 13-ER-3152, 13-ER-3155.

In rebuttal, the government repeatedly invited jurors to convict for what Lee *hadn't* said in the government's clips. *See, e.g.*, 13-ER-3203:11–15 ("What's important, when you look at those recordings and listen and read them, what is the defendant not saying, and how would an innocent person be reacting to those conversations?"). The prosecutor went on to suggest that defense counsel "left out a lot of context during the clips that he played of those recordings because he has to." 13-ER-3200:21–22. The jury had no way to appreciate the irony of the prosecutor accusing defense counsel of "play[ing] one clip of a recording and then just argu[ing] what it means and tak[ing] out all the other context from the recordings." 13-ER-3205:11–13.

18

### 6. Verdict

After one regular juror's replacement by alternate juror 2, 13-ER-3239, the alternate-juror position that had belonged to the subject of the *Batson* challenge, 6-ER-1317, the jury reached a guilty verdict on all three counts as to both defendants on June 27, 2022. *See* 13-ER-3279.

## D. Sentencing

The Probation Office prepared presentence investigation reports ("PSR") and recommendation letters. *See* Lee PSR, 940 Hill PSR; *see also* Prob.'s Rev. Rec. Ltr. Re Lee ("Lee Ltr."), Prob.'s Rev. Rec. Ltr. Re 940 Hill ("940 Hill Ltr.").

The PSRs initially set Lee's total offense level at 30 and 940 Hill's at 28. Lee and the government initially agreed with Probation that the Guidelines range for Lee's fine was $30,000 to $300,000. 940 Hill agreed that the Guidelines fine for 940 Hill was $1.5 million, though it noted the applicability of Guidelines § 8C3.4, providing for an offset in proportion to Mr. Lee's ownership stake. 3-ER-580–81.

Probation recommended a statutory-maximum fine of $750,000 (the maximum on each count of conviction) for Mr. Lee, and, for 940 Hill, a statutory-maximum fine of $1.5 million. Lee Ltr.; 940 Hill Ltr.

The defendants' sentencing briefing noted the lack of supporting analysis from Probation concerning Mr. Lee's fine and requested fines of $150,000 for Mr. Lee and $600,000 for 940 Hill. *See* 3-ER-575, 2-ER-273.

On July 21, 2023, the district court fined Mr. Lee the statutory-maximum $750,000. 1-ER-8. It imposed a fine of $1,078,125 on 940 Hill, calculated by applying the § 8C3.4 offset to the statutory maximum. 1-ER-2; 1-ER-78:13.

At the hearing, the district court indicated it intended to reduce the total offense levels by 2 to recognize impending Guidelines Amendment 821, which was expected to create, and by now has created, a 2-level downward adjustment for qualifying zero-criminal-history-point defendants under a new Guidelines § 4C1.1. 1-ER-22. The result, the district court stated, was a total offense level of 28 for both defendants. *Id*. Lee's counsel noted that the reduction of the total offense level should also reduce the range for Lee's fine under § 5E1.2 to $25,000 to $250,000. 1-ER-23:17. The district court responded only by saying "All right. Then I'll move on to the factual objections." 1-ER-23:19–20. The district court never clarified this or expressed awareness

20

of a reduced Guidelines range for Lee's fine after the § 4C1.1 adjustment or variance; and never discussed the fine imposed in relation to any Guidelines range—the original $30,000-to-$300,000 or the reduced $25,000-to-$250,000 range.

The court referred to some of the 18 U.S.C. § 3553(a) factors generically, but skipped mitigating Guidelines factors bearing on the fine amount, instead focusing tightly on Mr. Lee having the *ability* to pay the maximum fine from liquid assets.  *See* 1-ER-72–74:14 ("Mr. Lee has significant assets that are liquid that he can liquidate to pay any fine.").

## VI.  SUMMARY OF ARGUMENT

**A.** The district court's total ban on social-media research during jury selection infringed Mr. Lee's, 940 Hill's, and their attorneys' First Amendment rights.  By definition, a court order that prohibits First Amendment speech activity in advance is a "prior restraint."  Reading speech online, as in public social-media profiles, is well-recognized as speech activity under the First Amendment.  So the ban was a prior restraint or other restriction on First Amendment activity.

More important than the label applied to the ban, though, is the fact that it had no supporting reasoning or findings. Therefore, it cannot withstand any form of First Amendment scrutiny. Because such an error is structural, the lack of findings alone necessitates reversal.

Moreover, the government presented no evidence to justify the ban. 1-ER-120–21. Supporting such a broad ban against these defendants would have been futile because they were not dangerous and there is no legally cognizable privacy interest in what we publish publicly on the internet. These points are icing on the cake, though, because a court can't infringe an objecting party's First Amendment rights without making factual findings or giving a reason.

**B.** The district court's mishandling of the defense's *Batson* objection to the strike of the sole remaining Asian venireperson also requires a new trial. The district court failed to probe the prosecutor's proffer of race-neutral reasons for the strike, citing no evidence to explain his ruling and thus omitting the "sensitive inquiry" required in *Batson* step three. But comparative juror analysis and the totality of other circumstances indicate by a preponderance that race was, in fact, a substantial motivating factor. When it came to four different *non-*

22

Asians, the prosecutor accepted the traits he complained of in the struck venireperson, showing his already vague, case-unrelated purported reasons for striking were pretextual. This Court should undertake *Batson* step three itself de novo and make that finding.

**C.** Next, the district court committed serious evidentiary errors when it excluded evidence of Lee's non-assertive questions posed to Kim in the surreptitious recordings. Lee's questions to Kim showed he didn't know what Kim had done with his money and that Lee had not directed Kim to bribe a public official. Accepting the defense interpretation of these questions would have meant acquittal. Yet the district court erroneously excluded them as hearsay, failing to recognize that context revealed their nonassertive intent. Alternatively, the district court had to admit Lee's recording clips under the rule of completeness, even if they were hearsay, to correct the misleading interpretation advocated by the government from the clips it excerpted from the same recordings.

**D.** The district court's instructions to the jury failed to sufficiently convey McDonnell's definition of "official act," permitting the jury to convict Lee based on the promise of informal acts, including those of

non-government officials, such as pressuring CREED to withdraw its appeal of the 940 Hill project.

**E.** The combined exclusion of critical exculpatory evidence showing Lee did not know what Kim had done with the money Lee paid him and the instructional errors permitting conviction for informal acts compounded and reinforced one another, creating an intolerable risk that the verdicts would have been different without these errors.

**F.** Finally, the district court committed numerous procedural errors in fining Mr. Lee the statutory maximum for each count, more than double the high end of the Guidelines range.

## VII. ARGUMENT

### A. The categorical ban on passively viewing prospective jurors' public social-media profiles violated the First Amendment and necessitates remand.

De novo is the standard applicable to this Court's review of the district court's complete ban on accessing or reading prospective jurors' social-media profiles during jury selection. "In cases raising First Amendment issues[,] an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of

24

free expression." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1038 (1991) (alteration, citations, and internal quotation marks omitted). The Court has also applied de novo review to "the 'district court's application of the law to the facts on free speech questions.' ... When a district court holds a restriction on speech constitutional, [the Court has] conduct[ed] an independent, de novo examination of the facts." *Daily Herald Co. v. Munro*, 838 F.2d 380, 383 (9th Cir. 1988) (citations omitted)). Where no justification for a First Amendment restriction appears in the record, this Court must reverse. *See, e.g.*, *Myron v. Terhune*, 225 Fed. App'x 434, 438 (9th Cir. 2007) (unpublished).

### 1. The social-media ban was per se error because there were no supporting factual findings.

A district court can never restrict First Amendment rights for no stated reason or without supporting factual findings. *See, e.g.*, *Press-Enter. Co. v. Superior Ct. of Cal., Riverside Cnty.*, 464 U.S. 501, 510–11 (1984) ("[T]he California court's conclusion that Sixth Amendment and privacy interests were sufficient to warrant prolonged closure [of voir dire] was unsupported by findings showing that an open proceeding in fact threatened those interests; hence it is not possible to conclude that closure was warranted." (footnote omitted)); *Johansen ex rel. N.L.R.B. v.*

25

*San Diego Cnty. Dist. Council of Carpenters of United Bhd. of Carpenters & Joiners of Am., AFL-CIO*, 745 F.2d 1289, 1294 (9th Cir. 1984) ("We must be provided with fact findings that inform us whether the hiatus injunction of primary picketing will help prevent the perpetuation of the effects of the unlawful secondary boycott. Without that information, we cannot fulfill our function of review."); *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1440 (9th Cir.), *modified*, 742 F.2d 520 (9th Cir. 1984) ("The first amendment interests involved here also would have required the district judge to make findings as to the necessity for the restrictions."); *United States v. Antar*, 38 F.3d 1348, 1362 (3d Cir. 1994) ("[T]he requirement that particularized findings of a compelling interest must be placed on the record before a hearing is closed or a record sealed is not only for the benefit of the reviewing court on appeal. It exists, most fundamentally, to assure careful analysis by the district court before any limitation is imposed, because reversal on review cannot fully vindicate First Amendment rights."). Because the district court restricted First Amendment rights without giving a reason or making supporting findings of fact, *see* 1-ER-121, it

erred regardless of any potential merits of banning public social-media research for jury selection in the abstract or in this case.

### 2. Banning passively researching prospective jurors' public social-media profiles was unsupportable in this case.

Viewing public social-media profiles is clearly protected by the First Amendment. *See Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (noting that "the most important place[] ... for the exchange of views[] ... is cyberspace ... and social media in particular"); *id*. at 108 ("[T]o foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights.").

Banning the passive consumption of prospective jurors' public social-media profiles was an overbroad prior restraint on Mr. Lee's, 940 Hill's, and their attorneys' First Amendment rights. *See, e.g., Alexander v. United States*, 509 U.S. 544, 550 (1993) (defining "prior restraint" to include a judicial order that forbids speech activity in advance); *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975) ("to deny use of a forum in advance of actual expression" is to impose a prior restraint). That the ban prevented the defendants from *receiving*, rather than expressing, information does not change the analysis. *See Va. State Bd.*

*of Pharmacy v. Va. Citizen's Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976); *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 743 (9th Cir. 2021) ("The First Amendment protects speech for the sake of both the speaker and the recipient.").

Moreover, "attorneys and other trial participants do not lose their constitutional rights at the courthouse door." *Levine v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 764 F.2d 590, 595 (9th Cir. 1985). Under *Levine*, a prior restraint on speech activity by litigation parties may be upheld only if the government establishes that three requirements are met. *Id.* First, "the activity restrained [must] pose[] either a clear and present danger or a serious and imminent threat to a protected competing interest." *Id.* Second, the order must be "narrowly drawn." *Id.* Third and finally, there must be no less restrictive alternative available. *Id.*

First, the district court did not articulate, much less substantiate, any protected competing interest when it imposed the ban. And indeed, the defense proposal threatened no protected interest. *Passive* review of *public* social-media profiles involves no improper communication with jurors; nor is it invasive, for the axiomatic reason that *public* social-media content isn't *private*. *See Phillips v. U.S. Customs & Border*

28

*Prot.*, 74 F.4th 986, 995–96 (9th Cir. 2023) (noting the lack of privacy interest in "open source information available to the public" such as "the type of information contained in ... social media profiles"); *Marquez v. Bd. of Cnty. Comm'rs Eddy Cnty.*, No. CIV 11-0838 JAP/KBM, 2015 WL 13638613 at *1 (D.N.M. Jan. 13, 2015) (collecting cases and concluding that social-media content is not private).

Second, the district court's complete ban on social media research was not narrowly drawn. For example, some jurisdictions permit a lawyer, under special circumstances, to advise or supervise the use of deceit to access private social-media information, whereas other jurisdictions do not. *See* John G. Browning, *Voir Dire Becomes Voir Google: Ethical Concerns of 21st Century Jury Selection* (Am. Bar Ass'n Apr. 25, 2019).[1] The defense proposal below—to review public profiles passively, without communicating with the profile holders—was at the most modest and clearly permissible end of the spectrum. *See id.* ("Like

---

[1] Available at https://www.americanbar.org/groups/tort_trial_insurance_practice/publications/the_brief/2016_17/winter/voir_dire_becomes_voir_google_ethical_concerns_of_21st_century_jury_selection/ (last visited Dec. 30, 2023) (contrasting Oregon's approach with those of other jurisdictions).

the New York and Oregon ethics opinions, [American Bar Association Formal] Opinion [14-]466 held that it is not unethical for a lawyer to review the Internet presence of a juror or potential juror, so long as the lawyer refrains from communicating, either directly or indirectly, with the juror, and neither an applicable law nor a court order has limited such review.").  Therefore, this ban was overly broad.[2]

Third, the district court failed to identify or analyze less restrictive alternatives to the complete ban it imposed.  For example, at least one district court elected to inform venirepersons that their social-media profiles could be searched and gave them an opportunity to adjust their privacy settings beforehand.  *See Oracle America, Inc. v. Google, Inc.*, 172 F. Supp. 3d 1100, 1103–04 (N.D. Cal. 2016).  But even in that case, the Court gave the parties an opportunity to object to the order, and it ultimately did not prohibit their access to social media.

---

[2] The ban would fail even if it were analyzed under the somewhat less demanding test for content-neutral speech restrictions, such as time, place, or manner restrictions.  *See Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1068 (9th Cir. 2020) (citing Supreme Court precedents to summarize intermediate and strict scrutiny tests).

### 3.    This error entitles the defendants to a new trial.

#### a.    The district court's prior restraint of social media research was structural error.

The consequence of a structural error is that the government cannot deprive the defendant of a new trial by showing the error was harmless beyond a reasonable doubt. *Weaver v. Massachusetts*, 582 U.S. 286, 299 (2017). Thus, for a structural error that was objected to at trial and then raised on direct appeal, the defendant "generally is entitled to 'automatic reversal' regardless of the error's actual 'effect on the outcome.'" *Id.* (quoting *Neder v. United States*, 527 U.S. 1, 7 (1999)).

In *Weaver*, the Supreme Court shed light on how to identify an error as structural. *Id.* at 294–99. The factors discussed there show that the error of the district court's ban was structural.

"First, an error has been deemed structural in some instances if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest." *Id.* at 295. This principle supports deeming the district court's ban structural error because the First Amendment is designed to protect speech rights that also apply outside the context of criminal prosecution.

"Second, an error has been deemed structural if the effects of the error are simply too hard to measure." *Id.* As an example, the Supreme Court offered the denial of a defendant's right to select their own attorney. *Id.* (Denial of the right of self-representation is also structural, *Neder*, 557 U.S. at 8, even though it would typically enhance the defendant's prospects for acquittal.) Because peremptory strikes can be potent in obtaining a more favorable jury, and the defense gets more of them than the government does, *see* Fed. R. Crim. P. 24(b), depriving the litigants the opportunity to make informed use of those peremptory strikes disproportionately burdens the defense. Indeed, the right to peremptory strikes is "one of the most important of the rights secured to the accused." *Swain v. Alabama*, 380 U.S. 202, 219 (1965), *overruled in part by Batson v. Kentucky*, 476 U.S. 79 (1986). But it is impossible to measure that burden with precision in a particular case, even though it seems quite probable that better-informed peremptory strikes would have led to a more defense-friendly jury. *Cf. United States v. Becerra*, 939 F.3d 995, 1006 (9th Cir. 2019) (deeming error structural because "[i]t is impossible to know whether the jury would have come to the same conclusion had the judge orally instructed them

32

as to the elements of the charges."). The effect of this error here is as hard to measure as the effect of denying a defendant the right to select their attorney. Therefore, this second principle from *Weaver* also counsels in favor of deeming the error structural.

Third, "an error has been deemed structural if the error always results in fundamental unfairness." *Weaver*, 582 U.S. at 296. Because the prior restraint of First Amendment rights is presumptively unconstitutional, the wholly unexplained ban on accessing publicly available social media satisfies the third *Weaver* factor too.[3] Indeed, if criminal defendants were required to show individualized harm, then they would be forced to adhere to the ban or forgo a speedy trial to pursue a writ to vindicate their First Amendment rights. This is because of the collateral-bar rule, which is one of prior restraints' most significant harms: "a person violating an unconstitutional law may not be punished, but a person violating an unconstitutional prior restraint generally may be punished." Erwin Chemerinsky, *Silence Is Not*

---

[3] The Supreme Court took care to note that its structural error categories were not "rigid" and that "an error can count as structural even if the error does not lead to fundamental unfairness in every case." *Weaver*, 582 U.S. at 296.

*Golden: Protecting Lawyer Speech Under the First Amendment*, 47 Emory L.J. 859, 867 (1998) (citing *Walker v. City of Birmingham*, 388 U.S. 307, 320 (1967), as an example of the application of the collateral-bar rule).

Fourth, under *Weaver*, "one other factor leading to the classification of structural error is that the [burdened right of the defendant] furthers interests other than protecting the defendant against unjust conviction." 582 U.S. at 299. The First Amendment right to access public information on the internet exists to support open communication in a free society, *cf, e.g.*, *Packingham*, 582 U.S. at 104–05, and not only to protect criminal defendants from unjust conviction. In addition, defendants have an important interest, unrelated to protection from unjust conviction, in knowing who is determining their guilt or innocence. *See United States v. Sanchez*, 74 F.3d 562, 565 (5th Cir. 1996) ("The defendant has a right to a jury of known individuals not just because information such as was redacted here yields valuable clues for purposes of jury selection, but also because the verdict is both personalized and personified when rendered by 12 known fellow

citizens."). Thus, all four *Weaver* structural-error factors weigh in favor of treating the First Amendment error below as structural.

Because the error is structural, because Lee and 940 Hill objected below, and because they now raise the error again on appeal in this Court, they are entitled to "'automatic reversal' regardless of the error's actual 'effect on the outcome.'" *Weaver*, 582 U.S. at 299.

b. **Alternatively, the government's must prove the ban harmless beyond reasonable doubt.**

Even if the error was not structural, it was constitutional error, and "[t]he burden of proving a constitutional error harmless beyond a reasonable doubt rests upon the government." *United States v. Velarde-Gomez*, 269 F.3d 1023, 1035 (9th Cir. 2001) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). "The test for determining whether a constitutional error is harmless is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *United States v. Bushyhead*, 270 F.3d 905, 913 (9th Cir. 2001) (citation and quotation marks omitted). The government cannot show that the error was harmless in this case.

For these reasons, the Court should recognize the overbroad, unexplained, unsupported ban on passive public social-media research as a First Amendment violation and remand the case for a new trial.

## B. The complete failure to perform step-three analysis of Lee's *Batson* challenge necessitates remand.

A discriminatory peremptory strike deprived Mr. Lee, an Asian-American, of the opportunity to have an Asian juror participate in deciding his guilt or innocence. Lee's *Batson* challenge should have been sustained because the Constitution forbids striking even one prospective juror for a discriminatory purpose, *Flowers v. Mississippi*, 139 S. Ct. 2228, 2248 (2019), and the prosecutor's purported reasons for the strike do not hold up to comparative analysis. This Court "review[s] de novo whether the district court properly applied *Batson*" and, if, as here, the district court failed to do so, this Court "may decide de novo whether the government's strikes were motivated by purposeful discrimination" or simply "remand to the district court, either for a factual hearing or for a new trial." *United States v. Alvarez-Ulloa*, 784 F.3d 558, 565–66 (9th Cir. 2015).

### 1. The three steps of *Batson* analysis

A *Batson* challenge implicates a three-step burden-shifting test. *E.g.*, *id.* at 565 (citing *Miller-El v. Cockrell*, 537 U.S. 322, 328–29 (2003)). First, the defendant must establish a prima facie case that the strike was based on an impermissible basis, such as race. *Id.* Second, if the court finds a race-based prima facie case, the burden shifts to the prosecutor to provide race-neutral reasons for the strike. *Id.* Third, the trial court must decide whether the prosecutor's reasons are race-neutral, "'relevant to the case,'" and genuine, rather than pretextual. *Id.* (quoting *Green v. LaMarque*, 532 F.3d 1028, 1030 (9th Cir. 2008)). The court "'must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available'" whether the defendant has shown purposeful discrimination. *Id.* (quoting *Green*, 532 F.3d at 1030). Purposeful discrimination is established if the defense shows by a preponderance of evidence that "race was a substantial motivating factor" for the strike. *Cook v. LaMarque*, 593 F.3d 810, 815 (9th Cir. 2010).

### a. Step one: Lee's prima facie case

Defense counsel made a prima facie case by identifying the fact that the prosecutor had struck the only remaining Asian venireperson,

who appeared Asian and had a Thai surname. *See* 1-ER-126:19. "[T]he only Asian juror was just struck by the Government. I just noticed that there's no Asian jurors left, and there seemed to be nothing about that juror that was interesting." 1-ER-128. Counsel elaborated, "I believe all the Asian jurors have been struck. I'm not sure, but there appears to be nothing other than the fact that he was Asian." 1-ER-128:25–129:2.

### b. Step two: the government's purported race-neutral reasons for the challenged strike

The prosecutor responded by "disagree[ing] that the juror was Asian," and stating "[i]f there's no Asian jurors left, it's because of the defense." 1-ER-129.

The district court expressed "concern" the venireperson might not be Asian, but made no finding whether the venireperson was Asian or whether the defense established a prima facie case. *Id.*

The prosecutor then offered three reasons for the strike. First, the venireperson was "a young student." Second, he "provided very little information." Third, he was a "computer scientist, studying computer science." *Id.*

### c.    Step three: the district court's ruling

With no supporting analysis, the district court found that "the government struck that witness [*sic*] for a nondiscriminatory reason." 1-ER-129.  That was the entire *Batson* ruling.[4]

## 2.    The district court erred at step three.

The district court's conclusory ruling flouted binding precedent on what step three must involve.  First, the trial judge failed to consider whether the prosecutor's reasons were "'relevant to the case,'" *Alvarez-Ulloa*, 784 F.3d at 565 (quoting *Green*, 532 F.3d at 1030).  Indeed, where a prosecutor's purported reasons are not "related to the particular case to be tried," as *Batson* requires, 476 U.S. at 98, the court must probe with even greater care whether they are pretextual.  *See Shirley v. Yates*, 807 F.3d 1090, 1108–09 (9th Cir. 2015).

The district court undertook nothing resembling "'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'"  *Id.* (quoting *Green*, 532 F.3d at 1030).  Had it done so, it would have concluded the prosecutor's stated reasons were not relevant

---

[4] Once a prosecutor has given an explanation and the trial court has ruled on discrimination, whether the defendant made a prima facie case is moot.  *Hernandez v. New York*, 500 U.S. 352, 359 (1991).

to the case. *See* 1-ER-129 ("[W]e are typically uncertain of how computer scientists and college students will react to deliberating with other jurors."). The district court therefore violated *Batson*'s procedural requirements.

### 3. By a preponderance of the available evidence, race appears to have been a substantial motivating factor for the challenged strike.

Upon recognizing a *Batson* procedural error, this Court can either remand for a factual hearing or decide the discrimination question de novo. *Cf. Alvarez-Ulloa*, 784 F.3d at 565–66. The person challenging the strike has the burden to show a preponderance of evidence that "race was a substantial motivating factor" for the strike. *Cook*, 593 F.3d at 815. The defense meets its burden in this case.

### a. Comparative juror analysis shows pretext.

Comparative juror analysis is a "centerpiece" of step three; *Boyd v. Newland*, 467 F.3d 1139, 1150 (9th Cir. 2006). The prosecutor's purported reasons for the strike do not withstand comparative analysis. *See Miller-El v. Dretke*, 545 U.S. 231, 241 (2005).

Four comparator venirepersons show that the prosecutor accepted each characteristic cited in support of the strike in a *non*-Asian. "Juror No. 2," who had a Hispanic surname, was an apparently young college

40

student and provided about as "little information" as the struck Asian venireperson had.[5] 6-ER-1237:17–1238:7. "Juror No. 17" also had a Hispanic surname and was a college student "currently going to Cal State Los Angeles" for a bachelor's degree; the prosecutor did not strike her, either. 6-ER-1271:11–1274:18. "Alternate No. 4" also had a Hispanic surname and was an apparently young college student. 6-ER-1319:17–1320:21. Finally, the prosecutor declined to strike another venireperson who had a Welsh surname and worked as a "software architect" and hence, within computer science. 6-ER-1328:10–1331:2.

The prosecutor's decisions not to strike these four non-Asian jurors, combined with the lack of relevance of his reasons to this case, strongly supports a pretext inference. This is more than it takes for the defendants to prevail. "A court need not [even] find all nonracial reasons pretextual in order to find racial discrimination." *Kesser v. Cambra*, 465 F.3d 351, 360 (9th Cir. 2006).

---

[5] This analysis relies on surnames as a proxy for protected characteristics, which is imperfect but not unusual in *Batson* appeals. *Cf. Nguyen v. Frauenheim*, 45 F.4th 1094, 1102 (9th Cir. 2022) (referencing Hispanic surnames extensively an indication of race); *United States v. Changco*, 1 F.3d 837, 840 n.1 (9th Cir. 1993) (following a similar practice while recognizing misidentification potential).

The government is sure to quibble about these comparators. But the defendants need not establish the comparator jurors were identical, only that they were similar enough to the stricken venireperson that one could infer a prosecutor sincerely motivated by their stated reasons to strike them too. "A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters." *Miller-El*, 545 U.S. at 247 n.6. Moreover, Lee only needs to show that race was a "substantial factor" motivating the strike, not that the strike was purely racially motivated. *See Cook*, 593 F.3d at 815.

### b. The prosecutor's suspicious denial that the venireperson was Asian casts further doubt on the already weak explanation.

Second, the prosecutor's denial that the venireperson he'd struck was Asian further indicates pretext. For starters, the venireperson's appearance and Thai surname each strongly indicated Asian heritage. On the first point, because this Court has no other way of considering his appearance, to complete the required sensitive inquiry in step three, this Court should review the struck juror's photograph to decide for itself whether his appearance is hard to recognize as Asian. *Cf.*

*Jamerson v. Runnels*, 713 F.3d 1218, 1226–27 (9th Cir. 2013) (supplementing state-court record with driver-license photos as evidence of venirepersons' racial appearance).

Between the prosecutor's pretextual, case-irrelevant reasons and this, there are too many oddities to miss the preponderance of evidence that race was not the only motivating factor, but a substantial one. Because a *Batson* violation is structural error, *Crittenden v. Chappell,* 804 F.3d 998, 1003 (9th Cir. 2015), a new trial must be granted.

## C. The district court erred by excluding admissible evidence Lee did not know the money he gave to Kim would be used to bribe Huizar.

This Court generally reviews "challenged evidentiary rulings for an abuse of discretion," *United States v. Lopez*, 4 F.4th 706, 714 (9th Cir. 2021), but it "review[s] de novo the [district] court's interpretation of the hearsay rule." *United States v. Town of Colorado City*, 935 F.3d 804, 807 (9th Cir. 2019). This claim turns on the Court's misapplication of the hearsay rule, so the Court should review it de novo.

### 1. Lee's nonassertive *questions* about what Kim did with the money were not hearsay.

Exhibits 118A and 118B were excerpts from a surreptitiously recorded conversation between Kim and Lee on March 20, 2019. The

43

excluded portions showed Lee did not know or intend that the money he gave Kim would be used as a bribe to Huizar or Esparza. None of the statements were offered to prove the truth of a factual assertion intended by Lee. Therefore, the Court erred in excluding them as hearsay and its error resulted from failing to understand that no utterance can be hearsay unless it is intended assertively.

Exhibit 118A included the following utterances by Lee: "But you said he didn't receive the money"; "Then who took the money?"; "Who took the money? Did George take it all?"; and "How much was given to the *union*?" 13-ER-3294–95. In Exhibit 118B, Lee said: "You know the LA Creed person. You could've met and talked – *settled* it. [UI] Paying those guys is not a problem"; "Honestly, we don't know" what payments were made to CREED; "If somebody said ['*give up*'] and they did, or if they, on their own… Since there isn't much fault'" and "You said *union* also gave up."[6] 13-ER-3297–98.

Apart from "Honestly, we don't know," Lee did not intend any of these utterances as factual assertions. Therefore, they were not

---

[6] Words in italics were originally spoken in English; the rest was translated from Korean.

44

hearsay. *See* Fed. R. Evid. 801(a) ("'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, *if the person intended it as an assertion.*" (emphasis added)). *United States v. Torres*, 794 F.3d 1053, 1060–62 (9th Cir. 2015), recognizes that questions can sometimes be hearsay, but only when they are intended assertively.

In Exhibit 118A, Lee's intent was to *find out* what had happened to the money, which is what he was literally *asking*. In addition to the utterances themselves and their context—in which Lee had *no reason* to assert lack of knowledge to Kim because, as the government emphasized in closing argument, Lee "didn't know ... that he was being recorded," 13-ER-3141—this is clear from how Kim responded. Understanding Lee's questions to be *intended as questions*, Kim responded with "I don't know, Mr. Lee." 13-ER-3295.

If there were ambiguity on this point, then it had to be resolved in Lee's favor. *See* Fed. R. Evid. 801 advisory committee's note ("The rule is so worded as to place the burden upon the party claiming that the [assertive] intention existed; ambiguous and doubtful cases will be resolved against him and in favor of admissibility.").

### 2. Lee's statements referencing CREED or the "union" were not offered for their truth.

In Exhibit 118B, meanwhile, the defense did not seek to admit the statements to prove that Kim, in fact, "[knew] the LA Creed person," 13-ER-3297, or that Kim had said the "union also gave up," 13-ER-3298, or that it was not a problem to pay CREED money to settle CREED's appeal. 13-ER-3297. *Regardless of the truth of those assertions*, these utterances evince Lee's lack of knowledge of how the money had been used, which was neither explicitly asserted nor intended as an implicit assertion. Therefore, Exhibit 118B was not hearsay as offered by the defense, and it too should have been admitted.

### 3. Exhibits 118A and 118B were reliable, crucial to the defense, and necessary to correct the government's misleading presentation.

"Even when evidence is excluded on the basis of a valid application of the hearsay rules, such exclusion may violate due process if the evidence is sufficiently reliable and crucial to the defense ...." *United States v. Lopez-Alvarez*, 970 F.2d 583, 588 (9th Cir. 1992); *see also Lopez*, 4 F.4th at 715 ("Portions of a document or recording are admissible ... notwithstanding the bar on hearsay evidence when offered 'to correct a misleading impression in the edited statement' introduced

by an opposing party." (citation omitted)). When the prosecution offers excerpts and "'excludes information substantially exculpatory of the declarant,'" the exculpatory information is admissible regardless of the hearsay rule. *Lopez*, 4 F.4th at 715 (citation omitted).

Exhibits 118A and 118B were reliable because they were recordings and Lee did not know he was being recorded. The excerpts introduced by the government created a misleading impression that Lee's March 2019 statements supported the inference that Kim acted pursuant to a plan to bribe Huizar and/or Esparza in 2017.

For example, the government emphasized in Exhibit 118C Lee's remark, "[I]t's not like we committed a deadly sin." 11-ER-2744–46. It elicited Kim's testimony that the "we" in that sentence meant Lee and Kim, and that the deed short of deadly sin was "bribery." 11-ER-2746. And it introduced Lee's recorded statement, "[Y]ou don't know how much they know," from Exhibit 118D and called Kim to testify that what Lee meant the government did not know about was a bribery committed by Kim and Lee. 11-ER-2748. The government thus used these recording excerpts, and many others, to try to create the

impression that Lee had, in fact, confessed to collaborating with Kim on a scheme to bribe Huizar.

Perhaps worse still, in rebuttal, the government accused *the defense* of "play[ing] one clip of a recording and then just argu[ing] what it means and tak[ing] out all the other context from the recordings." 13-ER-3205:11–13. The government also intimated that other clips, which had not been admitted into evidence, would have provided further evidence of guilt, of course without acknowledging the court had excluded exculpatory defense clips. *See* 13-ER-3200:14–3201:1.

The government can't carry its burden to show the district court's hearsay and completeness rulings harmless, *see Lopez*, 4 F.4th 714 (describing the applicable harmlessness burden and standard), because nothing was more important in this case than where Mr. Lee believed and intended his money would go, and the excerpts of the recordings the district court excluded were powerful evidence that Mr. Lee did not intend to bribe Huizar. If Lee intended to pay a mere consulting fee to Kim or to pay CREED to induce CREED to withdraw its appeal, then the defendants were not guilty of the bribery charges in Counts Five and Twenty-Five. The harm from excluding the defense's clips is also

48

clear from the centrality of the government's clips from the same conversation in its closing argument. *See, e.g.*, 13-ER-3145:23–3147:4. Reversal is therefore required to remedy these erroneous exclusions of exculpatory evidence.

### D. Jury Instructions

This Court reviews de novo whether a jury instruction correctly states the law. *United States v. Renzi*, 769 F.3d 731, 755 (9th Cir. 2014). A new trial is warranted "if the instruction actually given was misleading or inadequate to guide the jury's deliberation." *Id.*

> **1. The Count Five instruction allowed the jury to convict Mr. Lee without proof of an "official act" as required by *McDonnell*.**

As trial approached, Mr. Lee asked the Court to instruct the jury, pursuant to *McDonnell*, that, to obtain a conviction for Count Five, the government was required to prove an "official act." *See* 1-ER-169–71. Mr. Lee made the following requests: First, Mr. Lee asked that the jury be instructed that the defendants could be convicted of honest-services fraud only if the government proved beyond reasonable doubt "that Huizar promised to vote to deny the CREED appeal if it reached" his committee. 1-ER-169. Second, Mr. Lee requested to delete references to Esparza "because, as Huizar's staffer, Esparza was not in a position

49

to commit the official act alleged in the [SI]." 1-ER-170. And third, assuming merely "pressuring" CREED to drop its appeal could also satisfy the "official act" requirement, Mr. Lee requested an instruction to limit the jury's consideration to those two putative official acts: '(1) pressuring [CREED LA] to dismiss its appeal against the 940 Hill Project and (2) voting to deny [CREED LA]'s appeal against the 940 Hill Project in the PLUM Committee.'" *Id.* (quoting 4-ER-906).

The district court rejected all three requests, deviating from *McDonnell*'s guidance that the only pressure that can qualify as an official act is pressure by one public official *on another public official* to take a specific *governmental* decision. *McDonnell* 579 U.S. at 567. By instructing that "[t]he official's decision or action may include using his official position to exert pressure on another official to perform an official act, or to advise another official, knowing or intending that such advice will form the basis for an official act by another official," 1-ER-112, declining to delete references to Esparza, *see* 1-ER-113, and denying the defendants' fallback request by failing to identify the events the jury could consider as possible official acts, *see* 1-ER-111–14 ,

the district court allowed jurors to consider convicting the defendants on multiple impermissible bases.

Equally importantly, by not specifying that CREED and its representatives weren't "officials" and denying the request to clarify that the jury would need to "find beyond a reasonable doubt that Huizar promised to cast ... a vote in exchange for the alleged bribe," 1-ER-169, the district court left it to the jury to piece together on its own that pressure applied on CREED couldn't be an official act. This was unreasonable and unrealistic because, in common usage, a union representative or officer can be called an "official." *See, e.g.*, Wikipedia, UNION REPRESENTATIVE, [https://en.wikipedia.org/wiki/Union_representative#:~:text=A%20union%20representative%2C%20union%20steward,labor%20union%20member%20and%20official](https://en.wikipedia.org/wiki/Union_representative#:~:text=A%20union%20representative%2C%20union%20steward,labor%20union%20member%20and%20official) (last visited Jan. 1, 2024) ("A union representative, union steward,[footnote omitted] or shop steward ... defends the interests of their fellow employees as a trades/labour union member and official."). So some indication that the jury instructions were using the word "official" inconsistently with one of its ordinary meanings was required.

51

But instead, the Count Five instruction invited misunderstanding by jurors by dropping the word "public" from the following critical sentence: "The official's decision or action may include using his official position to exert pressure on another official to perform an official act, or to advise another official, knowing or intending that such advice will form the basis for an official act by another official." 1-ER-112. Although this language tracks *McDonnell*, the relevant passage in *McDonnell* was not designed for direct insertion into jury instructions. The jurors, of course, were not responsible for reading *McDonnell* and, as laypersons, they had no reasonable way to discern whether "official" was short for "public official" or, instead, a more general term than "public official." The more general interpretation would lead to a wrongful conviction because it would include a CREED official.

Therefore, there can be no assurance the jury did not convict the defendants of Count Five based on (1) pressure on CREED, in violation of *McDonnell*'s "official act" requirement, (2) a putative "official act" that Esparza could not carry out, or (3) some "official act" aside from the two identified by the government in its pretrial disclosure.

52

### 2. The Count Twenty-Five instruction allowed a conviction without a bribe in connection with *government* business.

Lee also objected to jury instructions that permitted the jury to convict him of Count Twenty-Five based solely on the Huizar-pressuring-CREED allegation. *See* 1-ER-174–75. He argued "the jury should be instructed that it can only convict defendants based on the vote-promise theory, not the union-pressuring theory, because of the statutory requirement that the bribe be 'intended to influence or reward' an agent 'in connection with any business, transaction, or series of transactions' of the government." 1-ER-174. The district court overruled the objection, explicitly telling the jury that it *could* convict based on the Huizar-pressuring-CREED theory. 1-ER-115.

The text of § 666(a)(2) requires that the *quo* of the prohibited bribe be connected with *government* business or that of an agency receiving federal funds. *See also United States v. Whitfield*, 590 F.3d 325, 345 (5th Cir. 2009) ("In order for section 666 to apply,[20] the bribe must be offered or accepted 'in connection with any business, transaction, or series of transactions' of the agency receiving federal funds."). The

Huizar-pressuring-CREED theory is not covered by § 666(a)(2) because CREED was not federally funded or a local-government agency.

Alternatively, *McDonnell*'s "official act" requirement applies to § 666(a)(2). The Ninth Circuit's pre-*McDonnell* position was contrary, *see United States v. Garrido*, 713 F.3d 985, 1001 (9th Cir. 2013), as are other circuits since *McDonnell*. *See United States v. Lindberg*, 39 F.4th 151, 165–69 (4th Cir. 2022); *United States v. Roberson*, 998 F.3d 1237, 1246–47 (11th Cir. 2021); *United States v. Ng Lap Seng*, 934 F.3d 110, 131–34 (2d Cir. 2019); *United States v. Porter*, 886 F.3d 562, 565–66 (6th Cir. 2018); *but see United States v. Martinez*, 994 F.3d 1, 6–7 (1st Cir. 2021) ("To convict López on Count Eleven, which was for federal programs bribery in violation of 18 U.S.C. § 666, the government was required to prove, among other things, that López accepted a thing of value while 'intending to be influenced' by it to perform an official act."). This Court has not reconsidered *Garrido* since *McDonnell*; it should do so here because § 666(a)(2) implicates the same constitutional concerns raised in *McDonnell*. *See* 4-ER-878–83.

### 3. The Count Five and Twenty-Five convictions must be vacated and a new trial ordered to remedy these instructional errors.

Errors in criminal jury instructions ordinarily require reversal unless the Court of Appeals is convinced beyond reasonable doubt the verdict was unaffected by the error. *United States v. Bachmeier*, 8 F.4th 1059, 1065 (9th Cir. 2021). Where jury instructions leave "no reason to think that [the jurors'] own intelligence and expertise [could] save them" from convicting on an impermissible basis, *Griffin v. United States*, 502 U.S. 46, 59 (1991), reversal is required. *See United States v. Barona*, 56 F.3d 1087, 1098 (9th Cir. 1995). There is grave doubt in this case as to whether the jury interpreted the instructions consistent with the law because the court denied the defendants' requested verdict forms, which would have identified the theory the jury found proven in this case. *See* 4-ER-768–76. Therefore, the Court must reverse Counts Five and Twenty-Five.

### E. The trial errors created prejudicial synergy, supporting reversal for cumulative error.

"Even if no error individually supports reversal, the cumulative effect of numerous errors may support reversal." *United States v. Inzunza*, 638 F.3d 1006, 1024 (9th Cir. 2011). "Where, as here, there

are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (citation omitted). Here, the jury instructions' failure to reflect the "official act" requirement combined prejudicially with the erroneous exclusion of Exhibits 118A and 118B, which should have been admitted to show that Mr. Lee understood his money would only be used to pay a settlement to CREED. Therefore, under the cumulative-error doctrine, the defendants' convictions must be vacated.

### F. The scantily explained $750,000 statutory-maximum fine on Lee—triple the high end of the correct Guidelines range—cannot stand because the district court committed several procedural errors.

Tripling the high end of the correct Guidelines range for Mr. Lee's fine to the statutory maximum, without explaining why such an upward variance should occur, was an abuse of discretion. This unreasonably high fine resulted from the following procedural errors:

### 1. Failure to correctly calculate the applicable Guidelines range for the fine

It is "procedural error for a district court to fail to calculate—or to calculate incorrectly—the Guidelines range ...." *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc).

The district court noted the probation officer calculated a $30,000 to $300,000 range for the fine, 1-ER-20, but did not say that it adopted that range as its own calculation, and later reduced the total offense level to 28, 1-ER-22, which corresponds to a lower fine range. The defense requested the court determine the range for the fine to be $25,000 to $250,000, pursuant to Guidelines Amendment 821 and § 5E1.2, applied using a total offense level of 28. *See id.* 1-ER-23.

It is difficult to discern from the record whether the district court's response—"All right. Then I'll move on to the factual objections"— meant that it considered the applicable Guidelines range settled as $25,000 to $250,000 or instead was merely acknowledging that the court had heard the defense attorney. *Id.* Later, the district court called $150,000 "the midrange of the guideline range," 1-ER-74:3–4, which is not the midrange of any Guidelines fine range. *See* U.S.S.G. § 5E1.2(c). If the court's mid-range estimate is understood to be the

57

midpoint between zero and $300,000, a $30,000 to $300,000 range would have been incorrect because the district court had previously determined the total offense level was 28, not 30. 1-ER-22.

This record shows that the district court failed to determine the correct Guidelines range for the fine before imposing it. *See Carty*, 520 F.3d at 991 (confirming the Guidelines "are to be kept in mind throughout the process"). If the court had done so, it is far less likely that the court would have varied upward from the correct range so disproportionately.

## 2. Failure to explain the fine amount in proportion to the Guidelines range

Sentencing courts must consider the extent of any variation from the Guidelines range "and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall v. United States*, 552 U.S. 38, 50 (2007). "[U]ncontroversial[ly]," this means "a major departure should be supported by a more significant justification than a minor one." *Id.* Therefore, "fail[ing] adequately to explain ... any deviation from the Guidelines range" is another procedural sentencing error. *Carty*, 520 F.3d at 993. An especially thorough explanation was

in order here because the court imposed a fine at the statutory maximum, which was triple the high end under the Guidelines.

Merely saying that the fine should "reflect the seriousness of the offense, promote respect for the law, provide just punishment, ... afford adequate deterrence ... [and be] punitive" isn't a careful explanation because *every fine* must do all those things. The only case-specific ground identified by the district court for maximizing this fine was that Lee had the *ability* to pay the maximum fine. 1-ER-74:10–14.

The ability to pay cannot be the sole benchmark for determining a fine. The Sentencing Commission advises, for a case like this one, that a much smaller amount than the statutory maximum generally *would* accomplish the purposes of a fine. Guidelines § 5E1.2(d)(5) and (6) also required setting the fine in consideration of the collateral consequences of the conviction and "whether the defendant previously has been fined for a similar offense." Both factors weighed in favor of a fine below the statutory maximum. Lee's felony conviction will greatly impair his future business prospects. *See* 2-ER-273. And Lee has never been fined for a similar offense. The district court's one-sided commentary falls short of reasoned disagreement with the Guidelines. *See also* 1-ER-

59

73:8–17 (purporting to list the Guidelines factors for determining the amount of the fine but omitting "whether the defendant previously has been fined for a similar offense").

### 3. Failure to address significant mitigating factors

"[W]hen a party raises a specific, nonfrivolous argument tethered to a relevant § 3553(a) factor in support of a requested sentence, then the judge should normally explain why he accepts or rejects the party's position." *Carty*, 520 F.3d at 992–93. Lee's counsel requested a within-Guidelines fine on nonfrivolous grounds, none of which the district court addressed. Specifically, counsel argued that the fine proposed by the Probation Officer and the government proposed was "not justified by [Lee's] conduct, by his history and nature, and his history and characteristics. That's really driven by the fact that he's a man of means. And I suggest that that's inappropriate." 1-ER-49:19–23. The Court failed to address any of those arguments, apparently imposing the maximum fine based solely on Lee's ability to pay it.

The district court's procedural errors were not harmless, because the district court failed to give any reason for its enormous deviation from the Guidelines range for the fine. *Cf. United States v. Munoz-*

*Camarena*, 631 F.3d 1028, 1031 (9th Cir. 2011) ("We are not convinced that the district court would impose the same sentence if the correct Guidelines range was 'kept in mind throughout the process,' *Carty*, 520 F.3d at 991, and a remand for resentencing is therefore required."). This Court should vacate the fine and remand with instructions to impose a Guidelines fine or make findings in support of any variance.

## VIII. CONCLUSION

The Court should vacate Lee's convictions and remand for a new trial. At a minimum, the Court should vacate Lee's fine.

Dated: January 5, 2024          Bienert Katzman Littrell Williams LLP

By: */s/ Ryan V. Fraser*
    John L. Littrell
    Ryan V. Fraser

    Attorneys for Defendant-Appellant
    Dae Yong Lee

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

Certificate of Compliance for Briefs

**Ninth Circuit Case No. 23-1687**

I am the attorney of record for Defendant-Appellants Dae Yong Lee and 940 Hill, LLC.

This brief contains 11,671 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1.

Dated: January 5, 2024      By: */s/ Ryan V. Fraser*
                                 John L. Littrell
                                 Ryan V. Fraser

**CERTIFICATE OF SERVICE**

I hereby certify that on January 5, 2024, I electronically transmitted the attached document to the Clerk's Office for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*/s/ Ryan V. Fraser*

Ryan V. Fraser