Nos. 23-1687, 23-1688

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

DAE YONG LEE AND 940 HILL, LLC,
*Defendants-Appellants.*

*CONSOLIDATED APPEALS FROM THE UNITED STATES DISTRICT
COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT NO. CR 20-326-JFW*

## GOVERNMENT'S ANSWERING BRIEF

E. MARTIN ESTRADA
United States Attorney

BRAM M. ALDEN
Assistant United States Attorney
Chief, Criminal Appeals Section

CASSIE D. PALMER
MACK E. JENKINS
Assistant United States Attorneys

1500 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012
Telephone: (213) 894-0363
Email: cassie.palmer@usdoj.gov

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

**DESCRIPTION**                                                     **PAGE**

I.     INTRODUCTION ................................................................. 1

II.    ISSUES PRESENTED ......................................................... 2

III.   STATEMENT OF THE CASE ............................................ 3

     A.    Jurisdiction, Timeliness, and Bail ............................ 3

     B.    Statement of Facts and Procedural History ............ 4

         1.    Trial evidence ................................................... 4

             a.    The appeal against 940 Hill's project ................... 4

             b.    The bribery scheme ................................... 6

             c.    Lee seeks Huizar's help to resolve CREED's appeal ............................................................... 7

             d.    Lee's negotiation and payment of the bribe ......... 9

             e.    Huizar and Esparza push CREED to drop its appeal by telling them Huizar will vote against it ............................................................... 16

             f.    Defendant's admissions and obstruction of justice ............................................................... 17

         2.    Indictment ...................................................... 22

         3.    Convictions .................................................... 22

         4.    Sentencing ..................................................... 22

IV.   SUMMARY OF ARGUMENT ........................................ 27

V.    ARGUMENT .................................................................... 32

## TABLE OF CONTENTS

DESCRIPTION                                                                PAGE

A.   The Court Did Not Plainly Violate Defendants' First
     Amendment Rights By Precluding Online Research of
     Jurors .................................................................................. 32

     1.   Facts ......................................................................... 32

     2.   Standard of review .................................................. 33

     3.   There was no clear or obvious error ....................... 34

     4.   Defendants have not shown an effect on
          substantial rights .................................................... 35

          a.   Any error was not structural ......................... 35

          b.   Defendants have not shown prejudice ............ 36

     5.   Defendants cannot satisfy the fourth prong ............ 38

B.   The District Court Properly Denied Defendants' *Batson*
     Challenge .......................................................................... 40

     1.   Facts ......................................................................... 40

     2.   Legal standards ....................................................... 41

     3.   Standard of review .................................................. 42

     4.   The district court did not clearly err in finding
          that defendant failed to demonstrate purposeful
          discrimination ......................................................... 42

     5.   There was no procedural error ................................ 48

C.   The District Court Did Not Abuse Its Discretion in
     Excluding Lee's Recorded Hearsay Statements .................. 49

     1.   Standard of review .................................................. 49

iii

# TABLE OF CONTENTS

**DESCRIPTION**                                                       **PAGE**

2. Facts .................................................................50

3. Lee's self-serving statements are inadmissible hearsay ..................................................52

4. The statements were not admissible under the rule of completeness (Rule 106)...................................55

5. Any error was harmless................................................56

D. There Were No Instructional Errors ...................................59

1. Standard of review.......................................................59

2. The district court did not abuse its discretion in instructing on the official act for honest services fraud ......................................................................60

3. The district court did not abuse its discretion in formulating the bribery instruction's "in connection with" requirement ......................................65

E. There Was No Cumulative Error ........................................66

F. The District Court Did Not Procedurally Err in Imposing the Statutory Maximum Fine on Lee ..................67

1. Standard of review.......................................................67

2. The correct Guideline range for the fine, based on offense level 30, was $30,000 to $300,000 ...................67

3. The court did not plainly err in explaining the fine.............................................................................69

VI. CONCLUSION ...............................................................75

iv

# TABLE OF AUTHORITIES

**DESCRIPTION**                                           **PAGE(S)**

## Cases

*Alverio v. Sam's Warehouse Club, Inc.,*
253 F.3d 933 (7th Cir. 2001) ................................................................ 47

*Batson v. Kentucky,*
476 U.S. 79 (1986) ................................................................ 42

*Chavez-Meza v. United States,*
585 U.S. 109 (2018) ................................................................ 69

*Cook v. LaMarque,*
593 F.3d 810 (9th Cir. 2010) ........................................................ 45, 46

*Flowers v. Mississippi,*
588 U.S. 284 (2019) ................................................................ 41

*Gall v. United States,*
552 U.S. 38 (2007) ................................................................ 70

*Hernandez v. New York,*
500 U.S. 352 (1991) ........................................................ 42, 44, 47

*Jamerson v. Runnels,*
713 F.3d 1218 (9th Cir. 2013) ................................................ 45

*McDaniels v. Kirkland,*
813 F.3d 770 (9th Cir. 2015) ................................................ 28, 49

*McDonnell v. United States,*
579 U.S. 550 (2016) ........................................................ 30, 61, 62, 64

*Miller v. Gammie,*
335 F.3d 889 (9th Cir. 2003) ................................................ 31, 66

## TABLE OF AUTHORITIES

**DESCRIPTION** **PAGE(S)**

*Morgan v. Illinois,*
504 U.S. 719 (1992) ................................................................. 38

*Neder v. United States,*
527 U.S. 1 (1999) ..................................................................... 63

*Nguyen v. Frauenheim,*
45 F.4th 1094 (9th Cir. 2022) .................................... 42, 44, 49

*Oracle America, Inc. v. Google Inc.,*
172 F. Supp. 3d 1100 (N.D. Cal. 2016) ................................. 39

*Packingham v. North Carolina,*
582 U.S. 98 (2017) ................................................................. 35

*Press-Enter. Co. v. Superior Ct. of California, Riverside Cnty.,*
464 U.S. 501 (1984) ................................................................ 34

*Purkett v. Elem,*
514 U.S. 765 (1995) ................................................................ 43

*Rivera v. Illinois,*
556 U.S. 148 (2009) ................................................................ 36

*Rosales-Lopez v. United States,*
451 U.S. 182 (1981) .......................................................... 36, 38

*Sims v. Brown,*
425 F.3d 560 (9th Cir. 2005) ................................................. 44

*Snyder v. Louisiana,*
552 U.S. 472 (2008) ................................................................ 47

*United States v. Adams,*
243 F. App'x 249 (9th Cir. 2007) ..................................... 72, 73

# TABLE OF AUTHORITIES

**DESCRIPTION**                                              **PAGE(S)**

*United States v. Bacon,*
   979 F.3d 766 (9th Cir. 2020) ............................................. 40, 41

*United States v. Baldwin,*
   607 F.2d 1295 (9th Cir. 1979) ............................................... 38

*United States v. Barragan,*
   871 F.3d 689 (9th Cir. 2017) .................................................. 62

*United States v. Bical,*
   819 F. App'x 26 (2d Cir. 2020) ............................................. 72

*United States v. Calderon,*
   2021 WL 5027792 (9th Cir. 2021) ................................... 37, 38

*United States v. Carpenter,*
   923 F.3d 1172 (9th Cir. 2019) ......................................... 34, 35

*United States v. Carty,*
   520 F.3d 984 (9th Cir. 2008) ........................................... 69, 70

*United States v. Changco,*
   1 F.3d 837 (9th Cir. 2007) .......................................... 43, 44, 49

*United States v. Charles,*
   581 F.3d 927 (9th Cir. 2009) .................................................. 35

*United States v. Chen,*
   754 F.2d 817 (9th Cir. 1985) .................................................. 63

*United States v. Chi Mak,*
   683 F.3d 1126 (9th Cir. 2012) ............................................... 33

*United States v. Collicott,*
   92 F.3d 973 (9th Cir. 1996) ................................................... 55

# TABLE OF AUTHORITIES

**DESCRIPTION** **PAGE(S)**

*United States v. Cruz-Escoto,*
476 F.3d 1081 (9th Cir. 2007)................................................................ 46

*United States v. Cruz-Perez,*
567 F.3d 1142 (9th Cir. 2009)................................................................ 68

*United States v. Eureka Labs., Inc.,*
103 F.3d 908 (9th Cir. 1996).................................................................. 69

*United States v. Galecki,*
89 F.4th 713 (9th Cir. 2023) .................................................................. 63

*United States v. Garrido,*
713 F.3d 985 (9th Cir. 2013)............................................................31, 66

*United States v. Gasca-Ruiz,*
852 F.3d 1167 (9th Cir. 2017)................................................................ 67

*United States v. Gonzalez-Aguilar,*
718 F.3d 1185 (9th Cir. 2013)................................................................ 37

*United States v. Guerrero,*
595 F.3d 1059 (9th Cir. 2010)................................................................ 44

*United States v. Hernandez-Arias,*
757 F.3d 874 (9th Cir. 2014).................................................................. 69

*United States v. Hernandez-Garcia,*
44 F.4th 1157 (9th Cir. 2022) ............................................42, 45, 47, 48

*United States v. Hernandez-Quintania,*
874 F.3d 1123 (9th Cir. 2017)................................................................ 42

*United States v. Hilgers,*
560 F.3d 944 (9th Cir. 2009)............................................................70, 71

## TABLE OF AUTHORITIES

**DESCRIPTION**                                              **PAGE(S)**

*United States v. Hinkson,*
    585 F.3d 1247 (9th Cir. 2009) (en banc)................................42

*United States v. Kilpatrick,*
    2012 WL 3237147 (E.D. Mich. 2012)....................................39

*United States v. Kimbrew,*
    944 F.3d 810 (9th Cir. 2019)................................................63

*United States v. Koziol,*
    993 F.3d 1160 (9th Cir. 2021)..............................................59

*United States v. Lindsey,*
    634 F.3d 541 (9th Cir. 2011)................................................36

*United States v. Lonich,*
    23 F.4th 881 (9th Cir. 2022) ..........................................62, 63

*United States v. Lopez,*
    4 F.4th 706 (9th Cir. 2021) .........................................passim

*United States v. Marcus,*
    560 U.S. 258 (2010) .......................................................34, 39

*United States v. Mikhel,*
    889 F.3d 1003 (9th Cir. 2018)..............................................48

*United States v. Moalin,*
    973 F.3d 977 (9th Cir. 2020)...............................................67

*United States v. Olano,*
    507 U.S. 725 (1993) ............................................................35

*United States v. Orozco-Acosta,*
    607 F.3d 1156 (9th Cir. 2010).............................................60

ix

## TABLE OF AUTHORITIES

**DESCRIPTION**                                              **PAGE(S)**

*United States v. Ortega,*
    203 F.3d 675 (9th Cir. 2000)...............................................52

*United States v. Padilla-Mendoza,*
    157 F.3d 730 (9th Cir. 1998)...............................................33

*United States v. Self,*
    535 F. App'x 181 (3d Cir. 2013)..........................................68

*United States v. Toomey,*
    764 F.2d 678 (9th Cir. 1985)...............................................38

*United States v. Torres,*
    794 F.3d 1053 (9th Cir. 2015)......................................passim

*United States v. Tsarnaev,*
    595 U.S. 302 (2022).........................................................38

*United States v. Valencia-Barragan,*
    608 F.3d 1103 (9th Cir. 2010).............................................67

*United States v. Vasquez-Lopez,*
    22 F.3d 900 (9th Cir. 1994)................................................46

*United States v. Zukerman,*
    897 F.3d 423 (2d Cir. 2018) ...............................................72

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,*
    *Inc.,*
    425 U.S. 748 (1976) .........................................................35

*Wade v. Terhune,*
    202 F.3d 1190 (9th Cir. 2000)............................................42

**Statutes**

18 U.S.C. § 666.........................................................22, 31

# TABLE OF AUTHORITIES

**DESCRIPTION**                                                        **PAGE(S)**

18 U.S.C. § 1343 ................................................................................22

18 U.S.C. § 1346 ................................................................................22

18 U.S.C. § 1519 ................................................................................22

18 U.S.C. § 3231 ..................................................................................3

18 U.S.C. § 3553(a) ......................................................................68, 69

18 U.S.C. § 3572 ..........................................................................69, 72

28 U.S.C. § 1291 ..................................................................................3

28 U.S.C. § 2106 ................................................................................40

**Rules**

Fed. R. App. P. 4(b)(1)(A)(i) ...............................................................3

Fed. R. Crim. P. 24(a)(2) ...................................................................38

Fed. R. Crim. P. 30(d) .......................................................................60

Fed. R. Evid. 801 ........................................................................52, 53

**United States Sentencing Guidelines**

U.S.S.G. § 5E1.2(c)(3) ......................................................................67

U.S.S.G. § 8C3.4 ...............................................................................25

No. 23-1678, 23-1688

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

*v.*

940 HILL LLC AND DAE YONG LEE,
*Defendants-Appellants.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT NO. CR 20-326-JFW*

## GOVERNMENT'S ANSWERING BRIEF

## I

## INTRODUCTION

Defendants Dae Yong Lee and 940 Hill, LLC ("940 Hill"), of which Lee was the majority member, paid a $500,000 cash bribe in exchange for Los Angeles City Councilmember Jose Huizar and his special assistant, George Esparza, resolving an appeal that a union organization had filed against defendants' real estate development project. The appeal had stalled the project, and Huizar had two

potential votes on the appeal: as the chair of the committee that would vote on the appeal and as a councilmember.  Lee used his friend Justin Kim—a real estate consultant, political liaison, and Huizar's number one fundraiser—as an intermediary to negotiate and deliver the bribe. After defendants paid the bribe, Huizar communicated to the union organization that he would vote against the appeal.  The union organization dropped its appeal, and defendants' project was approved. When the FBI's investigation closed in on Lee, he tried to cover up the bribe by falsifying 940 Hill's accounting records and income tax filings.

A jury convicted defendants of honest services fraud, bribery, and altering records.  This Court should affirm.

## II

## ISSUES PRESENTED

A.    Whether the district court plainly violated defendants' First Amendment rights by precluding them from conducting online research of prospective jurors.

B.    Whether the district court clearly erred in rejecting defendants' *Batson* challenge.

C.     Whether the district court abused its discretion in excluding as inadmissible hearsay Lee's self-serving statements in a recorded conversation.

D.     Whether the court properly instructed the jury on (1) the "official act" requirement for honest services fraud and (2) the requirement for federal-program bribery that the bribe must be in connection with government business.

E.     Whether there was cumulative error.

F.     Whether the district court procedurally erred in imposing the statutory maximum fine on Lee.

# III

# STATEMENT OF THE CASE

## A.     Jurisdiction, Timeliness, and Bail

The district court had jurisdiction under 18 U.S.C. § 3231.  This Court has jurisdiction under 28 U.S.C. § 1291.  The district court entered judgment on July 25, 2023.  (1-ER-2-13.)  Defendants filed timely notices of appeal on August 3, 2023.  (4-ER-1046; 5-ER-1055.) *See* Fed. R. App. P. 4(b)(1)(A)(i).

Lee is in custody.

**B.     Statement of Facts and Procedural History**

*1.     Trial evidence*

*a.     The appeal against 940 Hill's project*

Lee (also known as David Lee) paid a $500,000 cash bribe on behalf of defendant 940 Hill in exchange for Councilmember Jose Huizar agreeing to leverage his vote to get rid of an appeal that was blocking defendants' $170 million redevelopment project.  (1-SER-174, 219; 6-ER-1395; 8-ER-1851-52; 9-ER-2217-19, 2150, 2153-54; 10-ER-2419.)

At the time, Lee was a sophisticated businessman with an extensive real estate portfolio, ran a thriving business, and had managed multiple real development projects in the Los Angeles area valued at over $400 million.  (1-SER-169, 207, 219; PSR ¶¶ 45-46; 10-ER-2417; 13-ER-3031-32, 3044.)[1]  Lee was the majority owner and ran the day-to-day operations of 940 Hill, a limited liability company that owned a property on the corner of South Hill Street and Olympic

---

[1] "AOB" refers to Appellant's Opening Brief, "CR" refers to the district court Clerk's Record, "PSR" refers to Lee's Presentence Report, and "Rec. Ltr." refers to the Probation Office's Recommendation Letter as to Lee.

Boulevard in Huizar's downtown Los Angeles district (the "Property"). (1-SER-169, 183; 3-ER-621; 6-ER-1395; 8-ER-1851-52; 10-ER-2417; 13-ER-3031-32, 3044.)

In July 2016, 940 Hill received conditional approvals (called entitlements) from the city planning department to redevelop the Property from a one-story building and parking lot into a 20-story high-rise with over 200 residential units and 20,000 square feet of commercial space (the "Project"). (1-SER-173-77; 8-ER-1835, 1849-50, 1857; 13-ER-2458-59, 3031-32, 3044.) 940 Hill hired a team of consultants to work on the Project, all of whom had written agreements with 940 Hill, submitted invoices for their work, and were paid by check. (*See* 7-ER-1527-34.) The company received letters of intent to purchase the Property for $30 to $34 million, contingent upon final approval of the entitlements. (7-ER-1536-41.)

Around a month later, however, a union organization called The Coalition for Responsible Equitable Economic Development LA ("CREED"), filed an appeal on the Project, which paused the conditional approval and meant delay, increased costs, and an uncertain future for the Project. (2-ER-451-42; 8-ER-1861-62, 1874-81, 1933, 1953, 1971-72;

5

9-ER-1995; 12-ER-2972, 2991-92.) The appeal eventually would have been voted on by the City Council's Planning and Land Use Management committee (PLUM), of which Huizar was the chairperson, and then the full City Council, where Huizar had substantial influence because councilmembers typically defer to the councilmember of the district where a development project sits. (8-ER-1962, 1969-73; 9-ER-1995, 2001.)

### b. *The bribery scheme*

Beginning in approximately 2013, Huizar and his special assistant and right-hand man, George Esparza, operated a bribery scheme through which they solicited benefits from real estate developers in exchange for Huizar agreeing to take official acts in favor of the development projects. (9-ER-2119-25; 10-ER-2301-02.) Huizar and Esparza used the term "friends of the office" to refer to developers "who never really told [them] no when [they] had a request," and "folks that always said yes and always came through, no matter what the request was." (9-ER-2127-28.) Huizar and Esparza tapped these "friends of the office" for bribes, soliciting political contributions, concert tickets, luxury vacations, and cash. (7-ER-1642; 9-ER-2121-28.)

6

By 2016, Kim—a real estate appraiser and Lee's close ally—was a "friend of the office" and Huizar's "No. 1 fundraiser." (8-ER-1974-76; 9-ER-2116; 11-ER-2573, 81.) Lee was one the "top guns" and "big whales" from whom Kim would solicit those donations. (9-ER-2127-28; 11-ER-2587 (Kim's success rate in asking Lee for contributions to Huizar was "[h]igh . . . [m]ore than 90 percent")). Being "a friend of the office" meant access to Huizar's office, including Esparza, and Esparza was "in touch with [Kim] on a daily basis" during this period. (9-ER-2059-60, 2116, 2120.)

### c. *Lee seeks Huizar's help to resolve CREED's appeal*

As an experienced real estate developer, Lee knew of Huizar's vast power over the real estate development approval process in Los Angeles. Kim told Lee that Huizar was "the final decision maker" for "all developments" in the "entire City" and that Kim was "very close" to Huizar, was Huizar's "top" fundraiser, and had access to Huizar. (11-ER-2589-91, 2606.)

Previously, Kim had sent emails to Lee and other developers to "teach them about how important politics is to what they want to accomplish." (12-ER-2818-22; *see, e.g.*, 2-SER-363 (2013 Kim email to

7

Lee tying public official's "support" of a project to political donations). A year before CREED filed its appeal, Lee had requested Kim's help in obtaining a support letter from Huizar on a visa matter relating to a development project. (11-ER-2629-31; 13-ER-3122.) Kim forwarded Lee's email to Esparza, referring to Lee as "one of the main supporters of" Huizar. (11-ER-2630.) Esparza quickly responded, "I'll take care of this for you," which Kim forwarded to Lee. (11-ER-2632-33.) Thus, prior to CREED's appeal, Lee knew how Huizar and Esparza operated: quick, positive responses for developers who never said "no." (*Id.*)

Lee's legitimate consultants also advised him of Huizar's power regarding the CREED appeal, explaining that Huizar had a close relationship with unions and would likely side with CREED on the appeal. (8-ER-1880-81; 2-ER-452 (email to Lee: "Huizar strongly supports all labor unions because they gave him financial and political support in getting him elected to City Council . . . At City Council it will be up to Huizar to decide if he supports our project or CREED LA . . . . Huizar will likely take CREEDLA's side if we fight them.").

It was not surprising, then, that on the day that CREED filed its appeal, Lee asked Kim to reach out to Huizar for help. (11-ER-2640,

8

2544-45; 2-SER-322-23 (showing 14 calls between Kim and Lee the day the appeal was filed).)  When Lee and Kim spoke, Lee wanted to turn to "Councilman Jose Huizar" "to have the appeal go away or drop the appeal," thereby avoiding a costly delay on the Project.  (11-ER-2647; 11-ER-2649 (Lee wanted Kim "to talk to Councilman Huizar to solve this appeal problem"); 11-ER-2649-50.)

Following that initial conversation, Lee emailed CREED's appeal to Kim.  (2-SER-307; 11-ER-2640.)  Kim forwarded the email to Esparza that evening, and Kim and Esparza had a conversation during which Kim had a "specific ask"—"if the councilman could help withdraw the appeal," "help pull the labor union . . . off this project."  (9-ER-2130-31; 2-SER-307.)

### d.   *Lee's negotiation and payment of the bribe*

Over the ensuing months, Lee and Huizar negotiated the bribe via their trusted intermediaries, Kim and Esparza, both of whom testified at trial.  Esparza was "the main middle person" for and "spoke on behalf of" Huizar.  (9-ER-2140.)  Huizar gave Esparza direction and Esparza then communicated Huizar's message to Kim.  (*Id.*)  Esparza received messages back from Kim, who "was negotiating with David Lee" and

9

"was in communication with [Lee] about this project." (9-ER-2140; 11-ER-2649-50 (Kim was Lee's "middleman" and "facilitator").) Esparza took notes of his conversations with the co-schemers on his phone, which he referred to in order to relay messages accurately among them. (*Id.*; 7-ER-1478; 9-ER-2142-43, 2157-58 (Esparza: Huizar "always told me to make sure I took good notes whenever he gave me direction"), 2189-92, 2194-95, 2207-08, 2220-21; 10-ER-2246, 2250, 2253.)

Lee's active role in negotiating and paying the bribe was demonstrated at trial through Esparza's phone notes and other documentary evidence detailing the timeline of communications between Lee and Kim and corresponding communications between Kim and Esparza and then Esparza and Huizar, including (1) Lee forwarding the appeal to Kim the day it was filed (2-SER-307; 11-ER-2640); (2) Esparza's notes of his communications with Kim and Huizar (1-SER-227-39), (3) metadata from Esparza's photographs and videos of the bribe money (1-SER-242-52, 253, 254-62, 263), (4) GPS data from Esparza's phone (1-SER-240, 241); and (5) the co-schemers' call logs and text messages (*e.g.,* 1-SER-265-306 (text messages between Kim and

10

Esparza)); 1-SER-318-321 (text messages between Kim and Lee); 1-SER-322-362 (call summary charts on relevant dates).)

The co-schemers generally avoided putting anything in writing and instead conducted sensitive conversations by phone or in person to avoid law enforcement detection. (9-ER-2138-41, 2158-60, 2178-80, 2207, 2210; 10-2467; 11-ER-2665-67, 2677-79; 11-ER-2736.) Lee and Huizar met once in person to solidify Huizar's assistance on the Project. Kim arranged a meeting with Huizar and Esparza at a karaoke bar to discuss Lee's request that Huizar help resolve the CREED appeal. (11-ER-2650-52, 2654-56.) Kim wanted to show Lee that Huizar was going to "help the appeal go away." (11-ER-2650-52, 2655-56, 2660 (CREED appeal was "the whole point" of Lee being at the karaoke bar with Huizar).) In a briefing before that meeting, Huizar's staffer, Shawn Kuk, told Huizar that the CREED appeal could make its way to PLUM and the City Council—meaning Huizar had voting power over it—and that Kim was "requesting your support in denying the appeal" on behalf of Lee. (9-ER-2010-12, 2177.) Lee joined the group in a private room at the karaoke bar, and the CREED appeal came up amid "really good drinks" and "women" offering "escort services." (9-ER-2132-33; 10-ER-

2390; 11-ER-2658-59.) Huizar gave a "thumbs up" and expressed that the Project could "count on" his support. (9-ER-2135.) As Esparza drove Huizar home later that night, they discussed that resolving the appeal would be a "heavy lift because of [Huizar's] relationships with the labor unions," and that Huizar had a "direct relationship" with Chris Modrzejewski, CREED's lobbyist. (9-ER-2136-38.) At 11:55 p.m. that night, Esparza texted Kim: "We need to meet tomorrow." (9-ER-2177.) The two arranged to meet in person. (9-ER-2138-40 (the meeting "was definitely in person because we had a fear that FBI or people would be listening to our conversations"); 9-ER-2178-80 (Esparza: "It was always best to meet in person with . . . Justin Kim on this particular project" because they "didn't want the FBI to hear our conversation.").)

At their meeting the next morning, Esparza told Kim that Huizar's help on the appeal would not be "free"—Huizar wanted money to make the CREED appeal go away. (9-ER-2138-40, 2178-80.) Immediately after this meeting, Kim called Lee. (2-SER-326.) The next day, Kim met with Lee and told him that Huizar "wanted money" to resolve the CREED appeal. (11-ER-2664-66.) Lee did not immediately

accept Huizar's demand (11-ER-2670), and instead pursued a parallel track, employing a team of legitimate consultants to respond to the appeal. (8-ER-1881-85, 1940-42; 10-ER-2456-58, 2460-61.) While mulling over Huizar's solicitation, Lee requested and received repeated extensions for 940 Hill's response to the CREED appeal, even after the consultants had completed their work. (8-ER-1869-70, 1881, 1929, 1941-44; 9-ER-2085, 2092, 2187-88.)

In December 2016, 940 Hill received an offer to purchase the Property for $33.8 million, contingent upon final resolution of all appeals related to the entitlements. (7-ER-1538, 1540-41.) This amount represented a profit of more than $20 million over the appraisal value in 940 Hill's redevelopment application. (3-ER-596; 10-ER-2459.) That same day, Lee and Kim had a phone call. (2-SER-330.) The day after receiving the offer, Lee sent Kim a text message with the CREED appeal case file number, and they had two lengthy phone calls. (2-SER-319, 330-31.)

On December 26, 2016, Lee and Kim spoke by phone and met; later that day, Kim messaged Esparza: "We need to meet for coffee this week about Olympic and Hill." (*Id.*; 9-ER-2193.) They met for coffee

13

the next day, during which Esparza recorded the following note on his phone: "Tell CREED to dismiss appeal." (9-ER-2193-95.) As usual, Lee and Kim spoke by phone before as well as the day after this meeting. (2-SER-333.)

About three weeks later, Huizar, Esparza, and Kim met in Huizar's private office at City Hall to discuss the bribe amount; Huizar requested $1.2. to $1.4 million (some of which would go to Esparza and Kim), which was a fraction of the cost of an agreement to include union labor on the Project. (9-ER-2206-07 (not having union labor on the Project would save the developer "$30 million in construction costs"); 9-ER-2209-10; 11-ER-2677, 2688-90.) After the meeting, Kim texted Lee: "Please give me a call at your convenience. Very important!!!!!" (10-ER-2337-38; 11-ER-2685; 2-SER-320.) Lee called Kim that evening. (11-ER-2685.) Lee said Huizar's requested amount was "too much," and later counteroffered $500,000 in cash. (11-ER-2688-89, 2699.) Lee suggested paying cash, which Kim understood would leave "no trace," so "no one would know." (11-ER-2689.) Ultimately, Lee agreed to pay the $500,000 cash bribe in three drops, the first before Huizar resolved the

14

appeal and the remaining two afterwards. (9-ER-2150, 2153-54, 2217-19 (discussing Esparza phone note).)

The flow of cash from Lee to Huizar mirrored their flow of communication. Lee took cash from the safes in his Crocker Street office (where he regularly kept between $1 and $3 million in cash), placed it in a paper bag, and gave it to Kim. (7-ER-1547; 9-ER-2151-52, 2154; 11-ER-2699, 2701, 2703.) Esparza picked up the paper bags of cash from Kim outside of Lee's office on February 10, 2017 ($200,000) and March 14, 2017 ($200,000). (6-ER-1435-36; 9-ER-2151-52, 2162; 11-2704; 13-ER-3106 (discussing GPS data from Esparza's phone and metadata from photographs and videos of the cash); 1-SER-240-41 (Esparza GPS data, Feb. 10 & Mar. 14).) Throughout, Kim kept Lee in the loop. (11-ER-2698.) For example, February 10 began with an 8 a.m. call between Lee and Kim; around 3 p.m., they had two more calls as Esparza arrived at the Crocker Street office, after which Kim and Esparza had several calls. (6-ER-1435; 2-SER-345.) Esparza later drove the cash to Huizar to show it to him, and Huizar asked Esparza to hold onto the cash for him. (9-ER-2154, 2157, 2162-65.)

On one occasion when Lee was taking a long time to provide the cash, Kim told Lee that Esparza was already waiting outside, which seemed to expedite Lee's delivery of the money. (11-ER-2702-03.)

### e. Huizar and Esparza push CREED to drop its appeal by telling them Huizar will vote against it

Consistent with his agreement with Lee, after Lee made the first $200,000 cash payment, Huizar directed Esparza to set up private meetings with CREED's lobbyist (Modrzejewski), first with Huizar and then with Esparza. (9-ER-2157-58; 12-ER-2973.) At Esparza's meeting with Modrzejewski, Esparza told Modrzejewski that Huizar "would be voting against the appeal" and wanted CREED to drop their appeal because "the developer" was "friends of the office." (9-ER-2157-59.) Modrzejewski stated that if Huizar could secure Lee's support for CREED jobs on Lee's larger Little Tokyo redevelopment project, Modrzejewski would see what he could do about dropping CREED's appeal. (9-ER-2159-61.) Huizar instructed Esparza to "[j]ust tell [Modrzejewski] yes so that we could get . . . this appeal dropped." (9-ER-2160.) A few days after their first meeting, Esparza met with Modrzejewski and told him they had a deal. (9-ER-2159-60.) Esparza conveyed this information to Kim with the understanding that Kim

16

would convey it to Lee.  (9-ER-2160-61.)  CREED withdrew its appeal on March 2.  (9-ER-2161; 11-ER-2711.)   The next day, Modrzejewski texted Esparza: "Appeal dropped today."  (9-ER-2161.)

The legitimate consultants on the Project had no idea that the appeal had been dropped.  On March 8, a consultant emailed the City requesting an extension and stating: "the developer's team has been working on negotiating with Creed LA, and it's almost in the final phase now."  (9-ER-2091-93.)  The City responded that CREED had withdrawn its appeal on March 2.  (*Id.*)  The consultants were "surprised" by this "unexpected" news.  (8-ER-1885-86; 9-ER-2063-64, 2094.)

In July 2017, Kim collected from Lee the final $100,000 of bribe money.  (11-ER-2718-19.)  Kim told Lee that the cash was going to Huizar but secretly kept that payment for himself.  (11-ER-2719-20.)

### f.    *Defendant's admissions and obstruction of justice*

In late 2018, the FBI executed search warrants at Huizar's City Hall office and residence, which was widely reported in the media (6-ER-1408-10; 13-ER-3081), and the government subpoenaed records

from one of Lee's companies, JOIA Accessories, relating to Huizar, Esparza, and others (7-ER-1489-98).

On March 5, 2019, the government executed a search warrant on Kim's phone. (7-ER-1550.) When Lee learned that the FBI had been investigating his co-schemers and had seized Kim's phone, Lee immediately got a new phone. (11-ER-2737-38.) A few days after Kim's phone was seized, Lee and Kim met and discussed the government's investigation. (11-ER-2736.) Kim told Lee that the FBI had seized his phone, he had hired an attorney, and he had told his attorney the truth about the amount of the bribe, among other information. (11-ER-2735-38.) Lee "was upset" that Kim told his attorney the truth about the "huge" bribe amount and encouraged Kim to fire his attorney so Kim could "match" his story with Lee's story. (11-ER-2738-40.)

On March 12, 2019, in Lee's presence, the government served a subpoena on 940 Hill requesting records related to Huizar, Esparza, Kim, and any development projects. (7-ER-1500-1507, 1596; 13-ER-3083-84.) Within days, Lee embarked on a plan to alter and make false entries in 940 Hill's accounting and tax records in order to cover up the 2017 bribe and impede the investigation. Lee directed a 940 Hill

18

employee, Jason Kang, to email the outside accountant who was preparing 940 Hill's taxes that "there might be an expense in 2018 [sic] regards to an entitlement." (7-ER-1595-96; 10-ER-2469-73, 2475.) Lee was blind copied (bcc'd) on the emails Kang sent regarding this false "expense." (7-ER-1600; 10-ER-2472-75; 11-ER-2529.) Kang testified that Lee provided all the information regarding this "expense," including the amount, when it was paid, what it was supposedly for, and how it should be categorized in the accounting records and on the tax forms. (10-ER-2469-73, 2478; 11-ER-2513.)

On March 20, 2019, Kim and Lee again met to discuss the FBI investigation. (11-ER-2740-41; 13-ER-3299-3304.) Unbeknownst to Lee, by this point Kim was cooperating, and he recorded the conversation. (11-ER-2740-41.) During that conversation, Lee made several incriminating statements. Lee counseled Kim to "take it easy" because "really, you don't know how much they know," so "don't worry . . . Just need to wait and see." (11-ER-2742-44, 2747-48; 13-ER-3300-04.) Lee told Kim, "I think they'll just catch a few big guys and end it . . . for the past ten years, they probably pocketed tremendous amounts;" "with government work . . . they're all employees after all," and "it's not

19

like we committed a deadly sin." (11-ER-2742-48; 13-ER-3300-01.)  Kim understood the "deadly sin" to be referring to the two of them committing "a bribery" (11-ER-2746), and those who pocketed money to be Huizar and Esparza (11-ER-2743).

Kim recorded another meeting with Lee on March 27, 2019.  (11-ER-2748.)  During that conversation, Lee coached Kim to blame Huizar: "Now, we were both played by Huizar . . . Us two . . . We were played by Huizar . . . . So you would have to blame him." (11-ER-2751-53; 13-ER-3313.)  After all, Lee reasoned, "Huizar was probably not caught with just one or two things.  The way I look at it—we're probably [*chuckling*] just a drop in the ocean." (11-ER-2754; 13-ER-3314.)

During the March 27 conversation, Lee confirmed repeatedly the amount of the bribe he had paid.  (7-ER-1598-1600; 13-ER-3306, 08.)  When Kim said he told his attorney the amount was $400,000, defendant responded: "But it's 500,000." (7-ER-1598; 13-ER-3306.)

That same day, Kang emailed 940 Hill's tax preparer (again bcc'ing Lee), stating, "I have not heard about the entitlement cost incurred in 2018 from Mr. Lee." (1-SER-221; 13-ER-3085.)  Shortly thereafter, Lee directed Kang to make entries in 940 Hill's accounting

20

records reflecting the $500,000 bribe paid to Huizar, falsely recording it as a legitimate expenditure incurred on December 31, 2018. (7-ER-1600; 10-ER-2475-78; 13-ER-3087-88.) After making those entries, Kang emailed the revised accounting records to the tax preparer, noting "I was advised and discovered that 940 Hill, LLC borrowed $500,000 from Dae Yong Lee in 2018 and the fund [sic] were directly paid to take care of the entitlement issues with Creed LA. Therefore, there should be increases in liability and also intangible assets (entitlement) in the amount of $500,000." (7-ER-1600; 10-ER-2473-75; 1-SER-220.)

Lee also signed 940 Hill's 2018 tax return falsely categorizing the bribe payment as a loan from Lee for a legitimate business expenditure for resolving the CREED appeal, and then caused the return to be filed. (7-ER-1605-09; 13-ER-3033, 3044.)

Before April 2019, there was no documentation whatsoever in 940 Hill's records reflecting this claimed $500,000 "expense"—no accounting entry, loan documents, consulting agreements, invoices, or checks. (7-ER-1533-35; 10-ER-2474; 11-ER-2516-17; 13-ER-3083-84.) Nor were there any consulting agreements, invoices, or checks relating to Kim's work on the Project. (7-ER-1533-34; 11-ER2611-14, 2704.) In contrast,

21

940 Hill had consulting agreements with, invoices for, and had paid checks to the ten other consultants on the Project. (7-ER-1527-34 (noting that every consultant was paid by check, not cash).)

### 2. Indictment

A grand jury returned a first superseding indictment against Lee, 940 Hill, Huizar, Esparza, and another developer and his company. (4-ER-908-1045.) Defendants Lee and 940 Hill were charged with three counts: (1) honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346 (count 5); (2) federal program bribery, in violation of 18 U.S.C. § 666(a)(2) (count 25); and (3) alteration of records in federal investigations, in violation of 18 U.S.C. § 1519 (count 38). (4-ER-1011, 1021, 1031.)

### 3. Convictions

Following a seven-day trial, a jury found Lee and 940 Hill guilty on all counts. (3-ER-741-48.)

### 4. Sentencing

The Presentence Report calculated Lee's offense level as 30 (PSR ¶ 88), corresponding to an advisory guidelines range of 97-121 months and a fine range of $30,000 to $300,000. (PSR ¶¶ 172, 182.) Lee had considerable assets, including numerous properties and businesses.

22

(PSR ¶¶ 145-68.)  He lived in a $7 million home (PSR ¶ 160) and reported adjusted gross income of over $4.8 million on his 2021 tax return (PSR ¶ 152).  He admitted he could pay the statutory maximum fine of $750,000 ($250,000 per count) "immediately."  (PSR ¶ 168.)  The Probation Office recommended the maximum fine in light of Lee's ability to pay and the costs of his sentence.  (Rec. Ltr. at 1, 6.)

The government concurred with the PSR's Guidelines calculation, but sought a sentence of 84 months, consistent with its recommendation for a two-level downward variance based on the anticipated adoption of Amendment 821, which created a new § 4C1.1 guideline providing a two-level decrease in offense level for certain offenders with zero criminal history points.  (2-ER-222-24.)  The government sought the maximum fine, which amounted to a fraction of Lee's enormous personal wealth, arguing that Lee used his vast wealth and access to stores of cash to pay the bribe.  (2-ER-225, 231, 237.)

Lee agreed with the PSR's Guidelines calculation and with the government's request for a variance based on the pending zero-point offender amendment.  (2-ER-256.)  He argued for a fine of $150,000 on

him personally and $600,000 on 940 Hill, which defendant asserted he had agreed to pay. (2-ER-280-81.)

At sentencing, the court granted the requested variance. (1-ER-22.). In calculating the guideline range, the judge stated, "[T]his really is a variance. So it's probably not proper to do it in phase 1, but I'm going to . . . It will be a total offense level of 28 with a range of 78 to 97 months." (*Id.*)

The government indicated that Lee's fine range was $30,000 to $300,000, such that the government was seeking an above-guidelines fine. (1-ER-23.) Defense counsel stated his understanding that, with the variance granted by the court, the fine range would be reduced to $25,000 to $250,000. (*Id.*) The court responded, "All right." (*Id.*)

Lee argued that because he would be taking responsibility for both his and the company's fines, the court should consider the joint fines as punishment against Lee. (1-ER-49.) Lee contended that "the conduct, . . . and his history and characteristics" did not warrant the maximum fine. (*Id.*)

After hearing the parties' arguments and Lee's allocution, the court sentenced Lee to 72 months' imprisonment and imposed the

statutory maximum fine of $750,000. (1-ER-86-87.) The court sentenced 940 Hill to five years' probation and imposed a fine of $1,078,125, representing that statutory maximum fine of $1,500,000 minus the offset provided in U.S.S.G. § 8C3.4.[2] (1-ER-75, 82.)

The court gave a lengthy explanation for Lee's sentence—spanning more than 20 transcript pages—including reviewing Lee's criminal conduct in detail, rejecting Lee's attempt to characterize his behavior as somehow aberrant, discussing the many letters of support showing "that defendant is a good man who made a huge mistake" (which the court considered to be a "factor weigh[ing] heavily in defendant's favor") (1-ER-65), and emphasizing the need for both specific and general deterrence in public corruption cases. (1-ER-52-77.)

In analyzing the fine, the court stated that the Guidelines emphasize the need to ensure that "the amount of the fine . . . taken

---

[2] The court may offset the fine imposed upon a closely held organization when an individual who owns at least a 5 percent interest in the organization has been fined for the same offense as the organization. U.S.S.G. § 8C3.4. The offset cannot exceed the total fine imposed on the individual defendant multiplied by that individual's percentage interest in the organization. *Id.* Here, the court awarded the maximum offset. (1-ER-75.)

together with other sanctions is punitive," and identified the relevant factors it was required to consider. (1-ER-73.) The district court also summarized the parties' and Probation Office's positions regarding the fine: (1) the Probation Office recommended the maximum fine "in light of the defendant's admitted ability to pay" (1-ER-73); *see* PSR ¶¶ 145-68 (detailing Lee's vast assets); (2) the government recommended the maximum fine to promote respect for the law and afford deterrence, "especially because Mr. Lee used his wealth to access the stores of cash to effectuate the crime in order to pay the $500,000 cash bribe to Mr. Huizar" (1-ER-74); and (3) defendants argued Lee's fine should be $150,000, and 940 Hill's fine should be $600,000, for a collective fine of $750,000, "especially in light of the fact that Mr. Lee has agreed to pay the fine imposed on 940 Hill." (1-ER-74.)

After considering the § 3553(a) and other relevant factors, the district court concluded that the maximum statutory fine was "indeed appropriate," given Lee's admitted "ability to pay the statutory maximum fine" and his "significant assets that . . . he can liquidate to pay any fine." (*Id.*) The maximum fine was necessary, the court explained, "to reflect the seriousness of the offense, promote respect for

the law, provide just punishment, and afford adequate deterrence and to ensure that the amount of the fine is punitive." (*Id*.) The district court rejected Lee's argument that his agreement to pay the minority shareholders' portion of the corporate fine warranted a reduction in his own fine, noting that "[t]hey are separate defendants which require individualized assessment." (1-ER-76.)

## IV

## SUMMARY OF ARGUMENT

A.     The district court did not plainly violate defendants' First Amendment rights by precluding online research of prospective jurors. First, there cannot be plain error because defendants cite no case that has recognized a First Amendment right to conduct research of prospective jurors during a criminal trial and instead rely on out-of-context principles in an attempt to piece together such a right. Second, any error was not structural, and defendants do not even attempt to establish prejudice. Finally, the fourth plain error prong is not satisfied because the voir dire process was adequate to identify unqualified jurors.

B.    The district court did not clearly err in finding that defendants failed to carry their burden of demonstrating purposeful discrimination under *Batson* when the government struck an Asian juror.  The prosecutor did not perceive the prospective juror as Asian—a belief shared by the district judge, who was in the best position to assess the prosecutor's credibility.  The prosecutor provided race-neutral reasons for the strike, including the juror's lack of life experience, brief responses, and major/profession, which have been recognized by this Court as legitimate justifications for striking jurors.  Additional circumstances further buttress the court's finding:  (a) the government's and the defense's overall pattern of strikes, (b) the prosecutor volunteered his reasons for striking the juror without being asked to do so, and (c) motive was lacking, since a key government witness also was Asian.

There was no procedural error under *Batson*.  At trial, defendants offered no response to the government's race-neutral reasons for striking the juror.  "Given that defense counsel said almost nothing, it is understandable that the [district] court did not say more."  *McDaniels v. Kirkland*, 813 F.3d 770, 778 (9th Cir. 2015).

C.     The district court did not abuse its discretion in excluding Lee's self-serving recorded statements as hearsay.  A defendant's self-inculpatory statements are admissible admissions by a party-opponent when offered by the government, but non-self-inculpatory statements are inadmissible hearsay.  Lee's statements, even when in the form of questions, constituted hearsay because defendants offered the questions for their implied assertions and sought to use them for the truth of the matter asserted—to demonstrate that Lee believed the $500,000 was for Kim and/or CREED, not to bribe Huizar or Esparza.  Nor are the statements admissible under the rule of completeness.  The government's excerpts containing Lee's implicit admissions to participating in the bribery scheme were not misleadingly tailored, so the additional statements Lee sought to introduce were not necessary to correct any misimpression from the admitted excerpts.  Regardless, any error was harmless because defendants introduced other evidence supporting their theory and overwhelming evidence at trial undermined Lee's claim that he did not intend the money as a bribe to Huizar or Esparza.

D.     The district court did not abuse its discretion in instructing on the official act for honest services fraud.  First, the court correctly defined "official act" consistent with *McDonnell v. United States*, 579 U.S. 550 (2016).  Defendant's proposed instruction was incorrect because a public official need not specify the means he will use to perform his end of the bargain.  Second, the court properly included Esparza in the instruction because the bribe recipient need not be the final decisionmaker.  Under *McDonnell*, it is immaterial that Esparza could not vote on the appeal, so long as Lee agreed to pay Esparza for exerting pressure on Huizar or advising him to vote against the appeal. And there was evidence that Esparza played such a role as Huizar's representative in the bribe transaction.  Finally, the district court was not required to specify the two possible official acts at issue because defendants have pointed to no third act that the government argued. There was neither error nor prejudice.

The district court also did not abuse its discretion in formulating the federal-program bribery instruction's "in connection with" requirement.  Even if the bribe was in exchange for Huizar and Esparza pressuring CREED to drop its appeal (rather than Huizar's vote against

30

the appeal), the bribe was "in connection with" City of Los Angeles business because the appeal was pending before City entities (the PLUM committee and City Council). This Court also should reject defendants' invitation to reconsider the holding in *United States v. Garrido*, 713 F.3d 985, 1001 (9th Cir. 2013), that 18 U.S.C. § 666 does not require an official act because nothing in *McDonnell* "undercut the theory or reasoning under [*Garrido*] in such a way that the cases are clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

Even if there was instructional error, it was harmless because the only theory the government argued was that Huizar and Esparza leveraged Huizar's vote to pressure CREED to drop its appeal by advising it that Huizar would vote against the appeal, and there was overwhelming evidence that defendants paid $500,000 for Huizar and Esparza to resolve the appeal, not merely for Kim to pay off CREED to withdraw it.

E.    There were no cumulatively prejudicial errors.

F.    The district court did not procedurally err in imposing the statutory maximum fine on Lee. Although the district court varied

31

downward in imposing the term of imprisonment, the offense level for purposes of determining the fine was 30. Nor did the court plainly err in explaining the fine. The court reviewed at length the nature and circumstances of the offense and defendant's history and characteristics and listed the specific statutory factors that supported the $750,000 fine. The court did not ignore defendant's mitigating arguments; it simply disagreed that they warranted a lower fine.

## V

## ARGUMENT

### A. The Court Did Not Plainly Violate Defendants' First Amendment Rights By Precluding Online Research of Jurors

#### 1. Facts

On the first day of trial, as the jury panel was "being assembled . . . in the jury room," the government learned that defendants intended to conduct "social media and Open Source research on proposed jurors." (1-ER-120.) Defendants had never mentioned or briefed the issue, despite two pretrial conferences discussing jury selection procedures and the parties' proposed voir dire questions. (1-SER-2-18 (parties' proposed voir dire), 1-SER-90-94 (hearing), 1-SER-151-56 (hearing).)

32

The government asked the court to preclude such research, noting that "some Courts expressly disallow that in jury selection, particularly in federal criminal trials," and that "[s]ome Courts are not aware it occurs." (1-ER-120.)

Defendants confirmed that they intended to conduct "passive review of information," which would not involve "making contact" or "trying to get into any private social media," and that counsel believed this conduct "doesn't violate any rules of the Court or of the Bar." (1-ER-121.) The court commented, "I wish that you would have raised that before," and ruled that it would not allow such research "for either side." (*Id.*) Defendants never mentioned the First Amendment, nor did they brief or renew the request at any point during or after trial.

### 2. *Standard of review*

A district court's voir dire procedures generally are reviewed for abuse of discretion. *United States v. Padilla-Mendoza*, 157 F.3d 730, 733 (9th Cir. 1998). However, defendants raise only a First Amendment claim. Where, as here, a defendant fails to raise a constitutional challenge below, review is limited to plain error. *See United States v. Chi Mak*, 683 F.3d 1126, 1134 (9th Cir. 2012). To

33

establish plain error, defendants must demonstrate that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010) (cleaned up).

### 3.    *There was no clear or obvious error*

For the first time on appeal, defendants contend that prohibiting internet research of prospective jurors violated the First Amendment rights of defendants and their counsel (AOB-24-30), but they cite no case that has recognized a First Amendment right to conduct research of prospective jurors' social media during a criminal trial.  Although they cite out-of-context principles which they ask this Court to piece together to recognize such a right[3], "[a]n error cannot be plain where

---

[3] For example, defendants argue that a court cannot restrict First Amendment rights without supporting factual findings, citing *Press-Enter. Co. v. Superior Ct. of California, Riverside Cnty.*, 464 U.S. 501, 510-11 (1984).  But whether a qualified First Amendment right of access exists in the first place depends upon whether the asserted right at issue passes the "experience and logic" test.  *United States v.*

(continued  . . . .)

there is no controlling authority on point and where the most closely analogous precedent leads to conflicting results." *United States v. Charles*, 581 F.3d 927, 933-34 (9th Cir. 2009) (quotation omitted). Thus, defendants' claim fails at prong two.

### 4. Defendants have not shown an effect on substantial rights

#### a. Any error was not structural

To avoid their burden of demonstrating prejudice, *see United States v. Olano*, 507 U.S. 725, 734 (1993), defendants argue that any error here was structural. It was not.

---

*Carpenter*, 923 F.3d 1172, 1178 (9th Cir. 2019). Defendants have made no showing under either prong of that test, and it is quite doubtful they could establish that such research has "historically been open to the press and general public." *Id.* Indeed, the Central District of California's local criminal rules prohibit disclosing the name of any juror or person summoned for jury duty except for purposes of summoning or notification of jurors and attendance/payment vouchers. L. Cr. R. 24-1. Similarly, *Packingham v. North Carolina*, 582 U.S. 98, 101 (2017), addressed a statute banning registered sex offenders from accessing social networking sites that provided mechanisms for users to communicate with each other, and thus has little bearing on the passive juror research defendants sought to conduct. And researching social media in the jury selection context differs from receiving advertising because "freedom of speech presupposes a willing speaker." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976).

Defendants characterize the alleged harm as depriving them of "the opportunity to make informed use of [their] peremptory strikes." (AOB-32.) But the Supreme Court and this Court have held that the erroneous denial of a peremptory strike is not a structural error. *Rivera v. Illinois*, 556 U.S. 148, 159-60 (2009); *United States v. Lindsey*, 634 F.3d 541, 548-51 (9th Cir. 2011). Other errors in jury selection, such as failing to honor a defendant's request to inquire into the jurors' racial or ethnic prejudices, also are not structural. *Rosales-Lopez v. United States*, 451 U.S. 182, 191 (1981) (reversible error only where "the circumstances of the case indicate that there is a reasonable possibility that racial or ethnic prejudice might have influenced the jury").

Likewise, the district court's prohibition on internet investigation of jurors preliminary to exercising peremptory challenges, even if erroneous, was not the type of error that "necessarily renders a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Rivera*, 556 U.S. at 160 (cleaned up).

### b. *Defendants have not shown prejudice*

To satisfy the third prong, defendants must establish "a reasonable probability that the [alleged] error affected the outcome."

*United States v. Gonzalez-Aguilar*, 718 F.3d 1185, 1189 (9th Cir. 2013) (cleaned up). They have not even attempted to do so.

In *United States v. Calderon*, which appears to be the only case where this Court has considered a ban on internet research concerning prospective jurors, this Court found no effect on substantial rights where the parties submitted joint voir dire questions that the district court asked of prospective jurors, no challenges for cause were denied, the court did not prohibit follow-up questions on any topic, and there was no allegation that any seated juror was biased or partial. No. 20-10234, 2021 WL 5027792, *1 (9th Cir. 2021) (unpublished). Similarly, here, the parties submitted voir dire questions covering both general questions about jury service and specific topics related to the case. (1-SER-2-18.) The court included some of the proposed voir dire questions in the questionnaire to the jury and allowed the parties to raise additional areas of inquiry at sidebar; defendants do not identify any specific area of inquiry they were prohibited from undertaking. (*See* 4-ER-786-790; 6-ER-1225, 1305, 1311.) Defendants also do not point to any biased juror or any challenge for cause that the district court did not grant. As in *Calderon*, "any harm from the district court's order is

entirely speculative," and defendants have "failed to demonstrate that [their] substantial rights were affected."  2021 WL 5027792 at *1.

### 5.   *Defendants cannot satisfy the fourth prong*

Despite defendants' creative attempt to fashion their argument on appeal as a constitutional claim, the Supreme Court has "repeatedly said that jury selection falls particularly within the province of the trial judge."  *United States v. Tsarnaev*, 595 U.S. 302, 312 (2022) (cleaned up); *Rosales-Lopez*, 451 U.S. at 189 ("[J]udges have been accorded ample discretion in determining how best to conduct the *voir dire*."); Fed. R. Crim. P. 24(a)(2) (court need permit only further questions it considers "proper").  "Sound judicial discretion" recognizes that parties have the right "to *some surface information* about prospective jurors which might furnish the basis for an informed exercise of peremptory challenges or motions to strike for cause based upon a lack of impartiality."  *United States v. Toomey*, 764 F.2d 678, 682 (9th Cir. 1985) (quoting *United States v. Baldwin*, 607 F.2d 1295, 1297 (9th Cir. 1979) (emphasis added)).  But the Constitution demands only that the process be "adequate . . . to identify unqualified jurors."  *Morgan v.*

*Illinois*, 504 U.S. 719, 729 (1992). The voir dire process here was more than adequate.

Furthermore, while some jurisdictions' bar or court rules permit the type of internet investigation defendants sought to undertake, courts also have recognized legitimate concerns with such practices. First, if jurors learn of counsel's investigation of their social media, they are more likely to disobey the court's admonition to refrain from conducting internet research about the case. *Oracle America, Inc. v. Google Inc.*, 172 F. Supp. 3d 1100, 1102 (N.D. Cal. 2016). Second, invading the lives of jurors who are compelled to serve by investigating their online activity risks diminishing the willingness of jurors to perform this important civic duty. *Id.* at 1107; *United States v. Kilpatrick*, No. 10-20403, 2012 WL 3237147, at *3 (E.D. Mich. 2012).

In sum, defendants have not shown that any error here seriously affects the "fairness, integrity, or public reputation of judicial proceedings" so as to warrant this Court's intervention. *Marcus*, 560 U.S. at 262.[4]

---

[4] If this Court were to find plain error, reversal is not warranted. Rather, a remand for the findings defendants claim the district court

(continued . . . .)

**B.** **The District Court Properly Denied Defendants' *Batson* Challenge**

*1.* *Facts*

Juror No. 30, a prospective alternate, was an undergraduate studying computer science, worked as a part-time grader at his school, was unmarried, had no children, had never served on a jury, and provided no other information. (6-ER-1317-18.) Defendant raised a *Batson* challenge to the government's peremptory strike of the juror, stating that "there's no Asian jurors left" and "there seemed to be nothing about that juror that was interesting." (6-ER-1326.) When asked for the prima facie case, counsel reiterated, "I believe all the Asian jurors have been struck. I'm not sure, but there appears to be nothing other than the fact that he was Asian." (6-ER-1326-27.) The prosecutor "disagree[d] that that juror was Asian" (6-ER-1327), and the court concurred. (*Id.* ("That's my concern.")). Defendants' counsel did not respond. (*Id.*)

---

failed to make would be "just under the circumstances." 28 U.S.C. § 2106; *see United States v. Bacon*, 979 F.3d 766, 770 (9th Cir. 2020) (en banc).

The prosecutor noted that defendants previously struck Asian jurors, whereas the government had not, "[s]o if there's no Asian jurors left, it's because of the defense." (*Id.*) The government then offered its reasons for the strike:

> because he is a young student, provided very little information. He's a computer scientist, studying computer science. And we are typically uncertain of how computer scientists and college students will react to deliberating with other jurors.

(*Id.*) The district court asked whether defendants wanted to respond, but counsel declined. (*Id.*) Following defendants' counsel's silence, the district court found "that the Government struck that [juror] for a nondiscriminatory reason." (*Id.*)

## 2. *Legal standards*

Under *Batson*'s three-part framework, "once a prima facie case of discrimination has been shown by a defendant, the State must provide race-neutral reasons for its peremptory strikes." *Flowers v. Mississippi*, 588 U.S. 284, 298 (2019). Then "[t]he trial judge must determine whether the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination." *Id.*

### 3.    *Standard of review*

*Batson* treats "intent to discriminate as a pure issue of fact."

*Hernandez v. New York*, 500 U.S. 352, 364 (1991).  Since a district

court's finding at the third step "largely will turn on evaluation of

credibility," this Court affords "those findings great deference."  *Batson*

*v. Kentucky*, 476 U.S. 79, 98 n.21 (1986).  Accordingly, a district court's

third-step *Batson* finding of no purposeful discrimination is reviewed for

clear error.  *United States v. Hernandez-Garcia*, 44 F.4th 1157, 1163

(9th Cir.), *cert. denied*, 143 S. Ct. 508, 214 (2022).  A finding is clearly

erroneous only if it is illogical, implausible, or without support in

inferences that may be drawn from facts in the record.  *United States v.*

*Hinkson*, 585 F.3d 1247, 1262-63 (9th Cir. 2009) (en banc).

### 4.    ***The district court did not clearly err in finding that defendant failed to demonstrate purposeful discrimination***

Although it is doubtful that defendants demonstrated a prima

facie case,[5] "once a prosecutor has offered a race-neutral explanation for

---

[5] Generally, "striking only one prospective juror who belongs to a
protected group is not enough to draw an inference without other
evidence." *Nguyen v. Frauenheim*, 45 F.4th 1094, 1101 (9th Cir. 2022)
(citing *Wade v. Terhune*, 202 F.3d 1190, 1198 (9th Cir. 2000)); *United*

(continued  . . . .)

42

the peremptory challenge[] and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *United States v. Changco*, 1 F.3d 837, 839-40 (9th Cir. 2007) (cleaned up). Defendants do not dispute that the government's stated reasons were race-neutral, so the only issue is the district court's finding at the third step. The Supreme Court has emphasized that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). The court did not clearly err in finding that defendants failed to carry that burden.

Significantly, government counsel did not perceive the prospective juror as Asian (particularly given that the jurors generally were masked during COVID), and the district court shared the same "concern." (4-ER-788-90; 6-ER-1228, 1327.) That subjective perception is critical because "[a] *Batson* challenge focuses on the perception of the race or ethnicity of the prospective jurors, not their actual race or ethnicity."

---

*States v. Hernandez-Quintania*, 874 F.3d 1123, 1129 (9th Cir. 2017) (nor is striking two prospective jurors).

*Nguyen*, 45 F.4th at 1102 n.3 (citing *United States v. Guerrero*, 595 F.3d 1059, 1063 n.3 (9th Cir. 2010)); *see also Hernandez*, 500 U.S. at 369-70 (affirming rejection of *Batson* claim regarding Latino jurors where prosecutor stated that he did not know which jurors were Latino).  The government's post-trial indication, after research, that the juror's name appeared to be Asian has no bearing on the prosecutor's perception of the juror's race during jury selection.  Moreover, ordinarily "surnames alone would not suffice for a *Batson* challenge." *Changco*, 1 F.3d at 840 n.1.  Defendant characterizes the prosecutor's perception as "suspicious" and asks this Court to substitute its judgment (AOB-42), but "[t]he district judge witnessed the prosecutor's behavior during voir dire and jury selection and was in a far better position than [this Court] to evaluate" whether the prosecutor engaged in purposeful discrimination. *Guerrero*, 595 F.3d at 1064.

Furthermore, the prosecutor provided valid reasons for the strike. This Court has recognized that "lack of maturity and life experience are nondiscriminatory reasons for a peremptory strike," *Nguyen*, 45 F.4th at 1103; *accord Sims v. Brown*, 425 F.3d 560, 574-76, *amended*, 430 F.3d 1220 (9th Cir. 2005), and those were legitimate concerns in this

high-stakes bribery case involving a powerful former elected official.
Juror 30's brief responses reinforced that concern. *See Hernandez-Garcia*, 44 F.4th at 1168 (upholding strike of juror who gave brief
responses, suggesting he may be a loner).

Occupation has also been found to be a non-pretextual reason for a
peremptory challenge where there is a race-neutral reason for believing
that the occupation would make the juror unfavorable. *Jamerson v.
Runnels*, 713 F.3d 1218, 1235 (9th Cir. 2013). For example, in
*Hernandez-Garcia*, the prosecution permissibly struck a research
scientist based on its concern that jurors with engineering backgrounds
accustomed to dealing with hard numbers and objective facts would be
skeptical of the government's case built on circumstantial evidence. 44
F.4th at 1167. Similarly, here the prosecutor expressed a valid concern
about a computer scientist's interpersonal skills. The question is not
whether this Court agrees with the prosecutor's strategy, but whether
the prosecutor engaged in purposeful discrimination. For example, in
*Cook v. LaMarque*, the prosecutor struck a juror because "she lacked
interpersonal experience, including the fact that she had never worked
outside the home." 593 F.3d 810, 821 (9th Cir. 2010). This Court found

no pretext.  Though "the prosecutor's conviction that homemakers have insufficient social skills to be good jurors" struck this Court "as outdated," it appeared "sincere."  *Id.*  Likewise, here, whether or not this Court agrees with the prosecutor's belief that the juror's youth and major suggested insufficient social skills to deliberate, nothing in the record shows his belief to be insincere.  *Cook*, 593 F.3d at 821.

Other considerations also support the district court's finding, including the government's and the defense's overall pattern of strikes.  At the time of the *Batson* motion, the government had used five peremptories and had excused no Asian jurors.  (6-ER-1257, 1271, 1283, 1287, 1307.)  Defendants' counsel, by contrast, had struck Asian jurors from the venire.  (6-ER-1327.)  *See United States v. Cruz-Escoto*, 476 F.3d 1081, 1090 (9th Cir. 2007) (in upholding finding of no purposeful discrimination, considering that "government's other peremptory challenges did not suggest a general pattern of discrimination against racial minorities," and that defense also struck Hispanic juror) (quoting *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994)).  The fact that the government volunteered its reasons without being required to do so further supports the district court's no-discrimination finding.

*Hernandez*, 500 U.S. at 369. Finally, the fact that Kim was a significant prosecution witness tended to undercut any motive to exclude Asians from the jury. *See id.* at 370.

The comparative jurors that defendants cite (AOB-40-41) were not similarly situated.[6] *See Hernandez-Garcia*, 44 F.4th at 1167-68 (noting that decision to strike a juror involves the interplay of various factors); *Alverio v. Sam's Warehouse Club, Inc.*, 253 F.3d 933, 941 (7th Cir. 2001) ("where a party gives multiple reasons for striking a juror, it is not enough for the other side to assert that the empaneled juror shares one attribute with the struck juror"). Juror No. 17 majored in criminal justice, had substantial work experience at law firms, and was married with four children. (6-ER-1271-74.) Alternate No. 4 was a college student but worked in a customer-facing job—as a server/busser in food service—and his father was a special agent with the Department of Justice, a fact plainly favorable to the government. (6-ER-1319-20.)

---

[6] "[A] retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial. In that situation, an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable." *Snyder v. Louisiana*, 552 U.S. 472, 483 (2008).

Juror No. 2 was a college student and provided relatively little information during her colloquy, but her prior work experience was also customer-facing—working as a receptionist at her school. (6-ER-1238.) Finally, the alternate juror who was a "software architect" had worked at the same job for a decade, was married, and had close cousins who were sheriff's deputies. (6-ER-1328-31.)

In sum, defendants failed to demonstrate that race was a "substantial motivating factor" for the strike. *United States v. Mikhel*, 889 F.3d 1003, 1029 (9th Cir. 2018). Accordingly, the district court did not clearly err in denying their *Batson* challenge.

### 5. *There was no procedural error*

Defendants' contention that the district court failed to conduct a sufficient inquiry at step three is meritless. "There is no requirement, as [defendants] urge[], that the prosecution's reasons be directly relevant to *the crime charged*." *Hernandez-Garcia*, 44 F.4th at 1167 n.7. In any event, the prosecutor's stated reasons were clearly relevant to this particular case—a high-pressure bribery prosecution involving a former high-level elected official.

At trial, defendants offered no response to the government's race-neutral reasons for striking the juror. "Given that defense counsel said almost nothing, it is understandable that the [district] court did not say more." *McDaniels*, 813 F.3d at 778; *see also Nguyen*, 45 F.4th at 1101 (court must consider any relevant circumstances "brought to its attention") (cleaned up); *Changco*, 1 F.3d at 840-42 (declining to consider new arguments on appeal challenging the prosecutor's justifications where "[a]fter the prosecutor gave [his] explanations, defense counsel stood mute and the district court upheld the strikes. Under these circumstances, it becomes impossible for us to give [defendant's newly raised] arguments meaningful consideration.").

There was no procedural error under *Batson*.

## C. The District Court Did Not Abuse Its Discretion in Excluding Lee's Recorded Hearsay Statements

### 1. *Standard of review*

This Court "review[s] the interpretation of the rules of evidence de novo, but a district court's decision to exclude evidence for abuse of discretion." *United States v. Torres*, 794 F.3d 1053, 1059 (9th Cir. 2015).

Application of the rule of completeness is reviewed for abuse of discretion. *United States v. Lopez*, 4 F.4th 706, 717 (9th Cir. 2021), *cert. denied*, 143 S.Ct. 121 (2022).

### 2. Facts

The government introduced excerpts of the recorded meeting between Lee and Kim on March 20, the day after Kim agreed to cooperate. In the admitted excerpts, Lee said they should "wait and see" what investigators knew (11-ER-2748), reasoning the government probably would "catch a few big guys and end it" (11-ER-2742). Referencing Huizar and Esparza, Lee said, "And not just one or two projects . . . I think for the past ten years, they probably pocketed tremendous amounts." (*Id.*) Kim asked if Lee was scared, and Lee said he was not, explaining, "Well, it's not like we committed a deadly sin." (11-ER-2744.) Kim understood that "we" referred to him and Lee and "deadly sin" referred to the bribery scheme. (11-ER-2745-46.)

Defendants sought to admit additional excerpts (Trial Exhibits 118A and 118B) from the conversation, which the district court excluded as hearsay. (11-ER-2501-09.) In the first proposed excerpt, Lee and Kim discussed where the bribe money ended up: "But you said

50

[Huizar] didn't receive the money." "Who took the money? Did George [Esparza] take it all?" "How much was given to the union?" (13-ER-3295.) Kim responded that he did not know, but "there is no way out of this," to which Lee responded, "There must be a way . . . . What they want is Huizar. It's nothing if they lock up Justin Kim." (*Id.*)

In defendants' second proposed excerpt, Kim raised Huizar's name and asked, "Could it be just us or were there others?" Lee responded, "He's probably done tens and hundreds." (13-ER-3297.) After Kim told Lee that "it won't do any good for you and I to lie," Lee suggested a cover story: "You know the LA CREED person. You could've met and talked—settled it . . . Paying those guys is not a problem." (*Id.*) Kim responded, "I don't know what [Huizar and Esparza] did—as far as paying," and Lee agreed, "Honestly, we don't know." (*Id.*) Lee elaborated that somebody said, "give up," and if they did so "on their own" then "there isn't much fault." (13-ER-3297-98.) Lee added, "You said the union also gave up." (13-ER-3298.)

On cross-examination, without objection, defendants questioned Kim about a portion of Exhibit 118B:

> Kim: Yes. But according to what I—I found out, we were played by George and Councilman Huizar to make money

51

out of nothing. It was nothing. I thought about it, and I'm sorry. I resented you a lot lately. I didn't even know what CREED was. Helping with political funds. So I thought they would just help. How did I know this would happen, that they would act this way? But I heard they often took advantage if there was a chance. I still think George did it. Yeah. Since George is close to me. Yeah.

(12-ER-2857.)

### 3. Lee's self-serving statements are inadmissible hearsay

When offered by the government, Lee's self-inculpatory statements were non-hearsay admissions by a party-opponent, Fed. R. Evid. 801(d)(2), but his "non-self-inculpatory statements are inadmissible hearsay." *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000). "If the district court were to have ruled in his favor, [Lee] would have been able to place his exculpatory statements before the jury without subjecting [himself] to cross-examination, precisely what the hearsay rule forbids." *Id.* (cleaned up).

On appeal, Lee has abandoned his primary claim below—that the statements were admissible under Rule 803(3) as then-existing state of mind. Nevertheless, defendants argue that Lee's statements about where the bribe money went were not hearsay because they were not intended as assertions and were not offered for the truth. (AOB-44-45,

46.)  Not so.  For hearsay purposes, a "statement" is "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."  Fed. R. Evid. 801(a).  That some of Lee's statements take the form of questions does not transform them into non-hearsay.  "[W]here the declarant intends the question to communicate an implied assertion and the proponent offers it for this intended message, the question falls within the definition of hearsay." *Torres*, 794 F.3d at 1059; *see also id.* at 1061 ("the term 'matters asserted' as employed in Rule 801(c) and at common law includes *both* matters directly expressed and matters the declarant *necessarily implicitly intended* to assert." (quotation omitted)).  That is the case here.

The defendant in *Torres* drove his truck across the border with 73 kilograms of cocaine in a hidden compartment; his defense was that he lacked knowledge of the drugs and modifications to his truck could have been made without his knowledge.  *Id.* at 1056.  Torres testified that he had loaned his truck to a friend in Mexico ("Fernando") on four occasions.  *Id.* at 1055, 1058.  Torres also sought to testify that on three occasions, Fernando had asked if Torres would drive Fernando's friend

53

to the DMV and a tire shop near San Diego, which Torres declined to do. *Id.* at 1057. The district court excluded those inquiries as hearsay because they were offered "for the assumption they are true to build a third-party defense" and if the inquiries were not presented on that basis, they were not relevant. *Id.* at 1058. This Court affirmed, holding that "the district court did not abuse its discretion in finding that Torres offered Fernando's inquiries for the truth of the matter asserted to prove his third-party culpability defense," *i.e.*, "Torres offered the questions for this intended implied message to show it was Fernando who was calling the shots and who unknowingly set him up on the drug importation scheme." *Id.* at 1061.

Here too, as the district court found (11-ER-2506), Lee's "questions" were implied assertions, and he sought to use the excerpts for the truth of the matter asserted to demonstrate his defense that he believed the $500,000 in cash was for Kim and/or CREED, not to bribe Huizar or Esparza.

The same reasoning applies to Lee's other "utterances" about Kim knowing "the CREED person," saying the "union also gave up," and that it was not a problem to pay CREED, which defendants offered for the

implicit assertion that Lee did not know how the bribe money had been used, *i.e.*, for the "truth of the defense asserted." *Torres*, 794 F.3d at 1061. As the district court correctly perceived, the statements were not relevant otherwise. (11-ER-2506.) Thus, the district court did not abuse its discretion in excluding Exhibits 118A and 118B as inadmissible hearsay.

### 4. *The statements were not admissible under the rule of completeness (Rule 106)*

Lee's additional statements were not admissible to "correct a misleading presentation." (AOB-46.) "[T]he rule of completeness does not compel the admission of inadmissible hearsay evidence simply because such evidence is relevant to the case." *Lopez*, 4 F.4th at 715. Rather, hearsay portions of a recording are admissible only "when offered to correct a misleading impression in the edited statement." *Id.* (cleaned up); *United States v. Collicott*, 92 F.3d 973 (9th Cir. 1996) (rule of completeness "does not compel admission of otherwise inadmissible hearsay evidence").

Unlike *Lopez*—where the government's editing cut off qualifying statements prematurely and at times mid-sentence to make it appear that the defendant believed the minor he attempted to entice was

55

underage, whereas the full recording conveyed a different impression, 4 F.4th at 715, 717—the portions of the conversation the government introduced here, in which Lee implicitly admitted to participating in the bribery scheme, were not misleading and were consistent with the full recording. Indeed, Lee made similar implicit admissions in the excluded excerpts; for example, when Kim asked, "Could it be just us or were there others?" Lee replied that Huizar had "probably done tens and hundreds." (13-ER-3297.)

### 5. *Any error was harmless*

Even if the district court erred, any error was harmless, as it "more likely than not had no material impact on the verdict." *Lopez*, 4 F.4th at 714. *Lopez* found a Rule 106 error harmless where the government's evidence was strong and the defendant presented other evidence disputing the knowledge element. *Id.* at 717-18. The same applies here. Overwhelming evidence at trial undermined Lee's claim that he did not intend the money as a bribe to Huizar or Esparza, including evidence of Lee's extensive involvement in the appeal and his constant communication with Kim before and after Kim's communications with Esparza and Huizar (7-ER-1599-1600; 10-ER-

2469; 11-ER-2609-10, 2636, 2667-70, 2698-2706); his personal meeting with Huizar, Esparza, and Kim about the appeal (11-ER-2657-58); his knowledge that Esparza picked up the cash from defendant's office (11-ER-2701-03); his recorded conversations with Kim showing defendant's knowledge of the scheme (13-ER-3314 ("Huizar was probably not caught with just one or two things . . . we're probably . . . just a drop in the ocean")), willingness to lie, and desire to coordinate stories (11-ER-2739-40; 13-ER-3299-3316); and his obstruction of justice through falsification of records (13-ER-3085-89). Further, the excerpts defendants sought to admit were themselves inculpatory, reinforcing that Lee was a participant in the bribery scheme but was looking for a "way out." (*See* 13-ER-3295.)

Moreover, defendants introduced other evidence to suggest that Lee intended to pay Kim or the union, not Huizar or Esparza. *See Lopez*, 4 F.4th at 718 (Rule 106 error harmless where other testimony mitigated prejudice from misleading excepts). They elicited from several witnesses that Kim, not Lee, was the person who communicated and had a relationship with Huizar and Esparza. (9-ER-1992-93; 11-ER-2690-91; 12-ER-2848-49, 2852.) Defendants questioned Kim about

57

a portion of Exhibit 118B, which they used to argue that Lee was unaware of what Kim was doing with the money. (13-ER-3160-62.) Defendants also elicited evidence that 940 Hill requested additional time to respond to the appeal in order to "negotiat[e] with the CREED" (8-ER-1943); Kim represented the ownership of 940 Hill (8-ER-1940, 1945-46); Kim held himself out to Lee and others as knowledgeable about CREED (12-ER-2878-80); Kim resented Lee (12-ER-2857); Kim told Lee that he found out they had been played by Huizar (*id.*); and Esparza told Kim that CREED previously was paid by developers to drop appeals (12-ER-2929). Defendants' counsel extensively cross-examined Kim about Lee's knowledge of where the money went and whether their conversations were explicit or implicit, during which Kim explained that some conversations were implicit. (12-ER-2875, 2925-28.) In closing argument, defendants argued that such evidence demonstrated that Lee intended to pay Kim for consulting or CREED to settle the appeal, not a bribe to Huizar. (13-ER-3165-66, 3197.)

The prosecutor's response to defense counsel's repeated invitations in closing argument for the jurors to speculate about the contents of the excluded recordings does not alter the harmlessness analysis. (*See, e.g.*,

13-ER-3160-61.)  In rebuttal, the prosecutor did not suggest that unadmitted excerpts would have provided further evidence of guilt, as defendants suggest.  (AOB-48.)  Instead, he argued that Lee's attempt to twist the meaning of *admitted* clips (13-ER-3159) was unpersuasive in the context of the entire recordings.  (13-ER-3200-01.)

Thus, "it is more probable than not that [any] error did not materially affect the verdict."  *Lopez*, 4 F.4th at 717 (cleaned up); *see also Torres*, 794 F.3d at 1063 (no constitutional error where testimony sought to be adduced "would not have added substantially to the knowledge the jury gained during the course of the trial").

## D.  There Were No Instructional Errors

### 1.  *Standard of review*

This Court "review[s] the formulation of jury instructions for abuse of discretion, but review[s] de novo whether those instructions correctly state the elements of the offense and adequately cover the defendant's theory of the case."  *United States v. Koziol*, 993 F.3d 1160, 1179 (9th Cir. 2021) (quotations omitted).  The question is "whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation."  *Id.* (quotations omitted).  Unpreserved instructional

challenges are reviewed for plain error.  Fed. R. Crim. P. 30(d), 52(b).

### 2. *The district court did not abuse its discretion in instructing on the official act for honest services fraud*

For count 5, the district court instructed, in relevant part, that the government must prove that "the scheme or plan consisted of a bribe in exchange for at least one official act *by Jose Huizar or George Esparza on the CREED LA appeal* filed against the 940 Hill Project."  (1-ER-111 (emphasis added).)  Defendants objected to the italicized language and instead sought an instruction substituting "by Jose Huizar, specifically a promise to cast a vote in the PLUM committee to deny the CREED LA appeal."  (1-ER-165.)

First, defendants renew their argument (1-ER-169) that their language was required to make clear that merely pressuring CREED to dismiss the appeal voluntarily is not an official act (AOB-52), but a defendant is not entitled to "particular language," as long as the jury instructions as a whole were adequate to guide the jury's deliberation. *United States v. Orozco-Acosta*, 607 F.3d 1156, 1165 (9th Cir. 2010). The instructions here provided sufficient guidance.  Defendants do not dispute that the court correctly defined an "official act" as "any decision or action on a question, matter, cause, suit, proceeding, or controversy

involving the formal exercise of governmental power." (1-ER-112.)  *See McDonnell*, 579 U.S. at 574.  The instructions identified the matter as "the CREED LA appeal filed against the 940 Hill Project," which was a matter "pending" before Huizar as a member of the PLUM committee and City Council.  (1-ER-111-12.)  The court instructed that "[m]erely arranging a meeting, hosting an event, or giving a speech" is not a sufficient "action" on the matter.  (1-ER-113.)  *See McDonnell*, 579 U.S. at 574.  Finally, the court instructed that the "official's decision or action may include using his official position to exert pressure on another *official* to perform an official act."  (1-ER-112 (emphasis added).)  CREED was not an "official," so the instruction excluded as a basis for conviction merely exerting pressure on CREED to drop its appeal unmoored to an official act on any matter pending before Huizar.[7]

---

[7] Contrary to defendants' speculation (raised for the first time on appeal), there is no reasonable likelihood, in the context of the full instruction—defining official act as a matter or cause "pending . . . before a public official"—that the jury would have understood the word "official" as referring to a CREED representative instead of a public official.  (AOB-51.)

Moreover, as the district court properly found, defendants' proposed instruction was legally incorrect. (1-ER-148-49.) *See United States v. Barragan*, 871 F.3d 689, 710 (9th Cir. 2017) (defendant not entitled to instruction that misstates the law). Defendants' proposal narrowly focused on a single means, but an official act "on" the CREED appeal did not require that Huizar specifically promise to vote against the appeal in the PLUM committee. Provided that Huizar agreed to resolve the appeal in exchange for defendants' cash, "the public official need not specify the means that he will use to perform his end of the bargain." *McDonnell*, 579 U.S. at 572. And an action eliminating the appeal before it came to a vote in the PLUM committee sufficed. *See id.* ("For example, a decision or action to initiate a research study—*or a decision on a qualifying step, such as narrowing down the list of potential research topics*—would qualify as an 'official act.'") (emphasis added).

Even if there was error, it was harmless. "Jury instructions, even if imperfect, are not a basis for overturning a conviction absent a showing that they prejudiced the defendant." *United States v. Lonich*, 23 F.4th 881, 898 (9th Cir. 2022) (cleaned up). An instructional error is

harmless "if, after a 'thorough examination of the record,' we are able to 'conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error.'" *United States v. Galecki*, 89 F.4th 713, 741 (9th Cir. 2023) (quoting *Neder v. United States*, 527 U.S. 1, 19 (1999)). That is the case here because the only theory the government argued was that Esparza and Huizar leveraged Huizar's vote to pressure CREED to drop the appeal, and there was overwhelming evidence that defendants paid $500,000 for Huizar and Esparza to resolve the appeal, not merely for Kim to pay off CREED to withdraw it. *See Lonich*, 23 F.4th at 901 (any instructional error on mens rea harmless where there was overwhelming evidence of intent).

Second, defendants contend Esparza's inclusion in the instruction was erroneous because he could not vote on CREED's appeal. (AOB-49.) But as the district court properly instructed the jury (13-ER-3255), "[t]he bribe recipient need not be the final decisionmaker." *United States v. Kimbrew*, 944 F.3d 810, 814 (9th Cir. 2019) (upholding conviction against congressional staffer); *see also United States v. Chen*, 754 F.2d 817, 825 (9th Cir. 1985) ("a person may be convicted of bribery [under § 201(b)(2)] even though the action requested is not within the

official's power to perform"). "A public official [Esparza] may also make a decision or take an action on a 'question, matter, cause, suit, proceeding or controversy' by using his official position to exert pressure on *another* official [Huizar] to perform an 'official act' [vote against CREED's appeal]" or "by using his official position to provide advice to another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *McDonnell*, 579 U.S. at 572. There was evidence that, as Huizar's representative in the bribe transaction, Esparza played such a role. (*See* 9-ER-2114-16, 2122-23; 11-ER-2597-2606, 2663-65; 2667, 2676-79, 2682-87, 2689-93, 2709-11.)

Finally, defendants contend that in a pretrial disclosure, the government supposedly limited itself to two official acts, so the instruction should have been limited accordingly. (1-ER-170.) The district court did not abuse its discretion in rejecting that request because the letter (4-ER-906-07) did not limit the government's ability to offer additional official acts. (1-ER-150.) Nor was there prejudice, as defendants point to no third act or theory that the government argued.

### 3. The district court did not abuse its discretion in formulating the bribery instruction's "in connection with" requirement

On count 25, the court instructed in relevant part:

Third, the defendant acted corruptly, that is, with an intent to influence or reward Jose Huizar or George Esparza in connection with any business, transaction, or series of transactions of the City involving anything of value of $5,000 or more. Specifically, the Government must prove that the defendant intended to influence or reward Jose Huizar or George Esparza in connection with the 940 Hill Project, including in (1) pressuring CREED LA to dismiss its appeal against the 940 Hill Project, or (2) voting to deny CREED LA's appeal against the 940 Hill Project in the PLUM Committee.

(1-ER-115.)

Defendants' argument that the pressuring-CREED theory is not covered by § 666(a)(2) "because CREED was not a federally funded or a local-government agency" is misplaced. (AOB-53.) Section 666(a)(2) requires only that the bribe be given with intent to influence or reward the government official "in connection with any business" of the organization receiving federal funding. Defendants paid Huizar and Esparza to use their official positions to pressure CREED to drop its appeal, which was pending before the City of Los Angeles, and, as part of that pressure, Huizar communicated that he would vote against the

appeal. Defendants' payment of a $500,000 bribe in exchange for Huizar and Esparza resolving the appeal therefore both pertained to and was "in connection with" City of Los Angeles business. [8]

Alternatively, defendants contend that this Court should reconsider *Garrido*, 713 F.3d 985 at 1001, which held that § 666 does not require an "official act," in light of *McDonnell*. (AOB-53-54.) But a panel of this Court cannot overrule binding Circuit precedent unless "intervening Supreme Court authority is clearly irreconcilable with our prior circuit authority." *Miller*, 335 F.3d at 900 (en banc). Defendants make no argument that *McDonnell* "undercut the theory or reasoning under [*Garrido*] in such a way that the cases are clearly irreconcilable." *Id.* Nor were defendants prejudiced, since the jury was properly instructed on the "official act" requirement for count 5 and found defendants guilty on that count.

## E.    There Was No Cumulative Error

There were not multiple errors (indeed there were none), but even if there were, "it is more probable than not that, taken together, they

---

[8] The same analysis regarding harmlessness for the honest services fraud instruction applies here. *See supra* Section V.D.2.

did not materially affect the verdict" given the strength of the evidence.

*United States v. Moalin*, 973 F.3d 977, 1006 (9th Cir. 2020).

## F.   The District Court Did Not Procedurally Err in Imposing the Statutory Maximum Fine on Lee

### 1.   *Standard of review*

This Court generally reviews the district court's interpretation of the Sentencing Guidelines de novo, its application of the Guidelines to the facts of the case for abuse of discretion, and its factual findings for clear error.  *United States v. Gasca-Ruiz*, 852 F.3d 1167, 1170 (9th Cir. 2017) (en banc).  However, claims of procedural error not raised at sentencing are reviewed for plain error.  *United States v. Valencia-Barragan*, 608 F.3d 1103, 1108 (9th Cir. 2010).

### 2.   *The correct Guideline range for the fine, based on offense level 30, was $30,000 to $300,000*

The fine guideline range for individual defendants is based on the defendant's offense level; for offense level 30, the range is $30,000 to $300,000.  U.S.S.G. § 5E1.2(c)(3).  Although it is not clear whether the court utilized a fine range based on offense level 28 or 30, Lee was not prejudiced even if the district court relied on a range of $30,000 to $300,000, corresponding to offense level 30, because that was the correct range.

67

While the district court chose to vary downward to impose a below-Guidelines sentence of imprisonment, the court correctly recognized that this variance did not determine the offense level at the Guidelines calculation stage. (1-ER-22 ("[T]his is really a variance. So it's probably not proper to do it in Phase 1").) *See United States v. Cruz-Perez*, 567 F.3d 1142, 1146 (9th Cir. 2009) ("a 'variance,' . . . occurs when a judge imposes a sentence above or below the otherwise properly calculated final sentencing range based on application of the other statutory factors in 18 U.S.C. § 3553(a)"). A court may, as the district court did here, choose to vary in one direction in imposing a sentence of imprisonment and the opposite direction in imposing the fine. *United States v. Self*, 535 F. App'x 181, 183-84 (3d Cir. 2013) (no procedural error where court correctly calculated advisory guideline range and imposed above-Guidelines term of imprisonment and below-Guidelines criminal fine).

Because the properly calculated offense level was 30, the correct guidelines range for the fine was $30,000 to $300,000. There was no error.

### 3. *The court did not plainly err in explaining the fine*

Lee argues that the court procedurally erred in imposing the statutory maximum fine of $750,000 "without explaining why such an upward variance should occur" (AOB-56) or addressing "significant mitigating factors" (AOB-59-60). Lee did not raise these claims below, so they are reviewed for plain error. There was no error, let alone plain error.

To determine the appropriateness of a fine and its amount, the district court must consult the Guidelines' range, the § 3553(a) factors, and the additional factors set forth in 18 U.S.C. § 3572. *United States v. Hernandez-Arias*, 757 F.3d 874, 884 (9th Cir. 2014). A court is not required, however, to explicitly state the court's application of each of these factors. *United States v. Carty*, 520 F.3d 984, 992 (9th Cir. 2008) (en banc) (§ 3553(a)); *United States v. Eureka Labs., Inc.*, 103 F.3d 908, 913 (9th Cir. 1996) (§ 3572).

"If the sentence is outside the Guidelines range (whether because of a 'departure' or a 'variance'), the judge must state 'the specific reason for the imposition of a . . . different' sentence." *Chavez-Meza v. United States*, 585 U.S. 109, 112 (2018) (quoting 18 U.S.C. § 3553(c)(2)). The

69

explanation must be sufficient to "permit meaningful appellate review," *Carty*, 520 F.3d at 992, and should reflect a justification "sufficiently compelling to support the degree of the variance," *Gall v. United States*, 552 U.S. 38, 50 (2007).  Adequate explanation may be "inferred from the PSR or the record as a whole."  *Carty*, 520 F.3d at 992; *accord United States v. Hilgers*, 560 F.3d 944, 947 (9th Cir. 2009) (no plain procedural error in explaining sentence that was three times guidelines range because "although the judge merely mentioned that the case is out of the heartland when deciding to impose a non-Guidelines sentence, the rest of the facts found at sentencing . . . expand[ed] on the simple 'heartland' explanation").

Here, the district court properly consulted the recommended Guidelines range, the statutory maximum fine, the statutory sentencing factors, and the statutory factors relevant to determining the appropriateness of the imposition of a fine and its amount.  (1-ER-23, 73.)  The court correctly noted that it was required to impose a fine "in all cases except where the defendant establishes he is unable to pay and not likely to become able to pay any fine," and that Lee had admitted he was able to pay the fine.  (1-ER-72-73.)  The court explained at length

the seriousness of the offense and the special need for deterrence and to protect the public in this case. (1-ER-52-72.) The court recounted the reasons underlying the Probation Office's and the government's recommendations for a $750,000 fine, including the manner in which Lee used his wealth and access to huge sums of cash to effectuate the crime. (1-ER-72-74.) In concluding that the statutory maximum fine was "indeed appropriate," the court cited Lee's admitted "ability to pay the statutory maximum fine" and his "significant assets that are liquid that he can liquidate to pay any fine." (1-ER-74.) The court listed the specific statutory factors that it found salient: the statutory maximum fine was necessary "to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence and to ensure that the amount of the fine is punitive." (*Id.*) Moreover, the district court explicitly rejected Lee's argument for a lower fine. The court explained that, although it was appropriate that Lee pay the minority shareholders' portion of the corporate fine because they knew nothing of Lee's bribe and obstruction of justice, Lee's agreement to pay the company's fine did not warrant a reduction in his

71

fine because "[t]hey are separate defendants which require individualized assessment." (1-ER-76.)

As the court's fulsome explanation demonstrates, the court did not impose the maximum fine solely based on Lee's ability to pay it, as Lee claims. (1-ER-60.) Nor was there anything improper about the court's emphasis on Lee's ability to pay. The court was statutorily required to consider Lee's "financial resources" and ability to pay, 18 U.S.C. § 3572(a)(1), (2), and "[a] fine can only be an effective deterrent if it is painful to pay, and whether a given dollar amount hurts to cough up depends upon the wealth of the person paying it." *United States v. Zukerman*, 897 F.3d 423, 431 (2d Cir. 2018); *United States v. Bical*, 819 F. App'x 26, 29-30 (2d Cir. 2020) (no plain error where district court imposed a fine more than five times the Guidelines range after stating its reasons for imposing the fine, including defendant's substantial liquid assets); *United States v. Adams*, 243 F. App'x 249, 250 (9th Cir. 2007) ("Socioeconomic status is different than financial resources. The former has no place in sentencing, but the latter is required by statute.") (cleaned up).

Finally, Lee's claim that the district court ignored his mitigation arguments that the maximum fine was "not justified by [Lee's] conduct" and his "history and characteristics" is baseless. (AOB-60 (quoting 1-ER-49).) The record amply demonstrates that the district court addressed these points, but largely disagreed with them. The court reviewed the many sentencing letters Lee submitted and recognized that his history and characteristics "weigh[ed] heavily in favor of [Lee] and his request for leniency." (1-ER-60-61.) Indeed, the court varied downward in imposing a term of imprisonment. However, the district court rejected Lee's attempt to portray his conduct as aberrant (1-ER-66), finding that the corrupt relationship with Huizar was one Lee "readily accepted and exploited to save his years of work and investment." (1-ER-58.) The court observed that "the $500,000 bribe was minuscule in light of the cost-benefit analysis of the millions of dollars in costs that the CREED appeal could add to the project or the loss of the entire project with an adverse vote in the PLUM committee." (*Id.*) The court further commented that Lee's "lack of remorse and arrogance" was apparent in Lee's recorded conversations, which "certainly did not fit the current characterization of the defendant as a

73

victim of the Huizar/Esparza pay-to-play scheme." (1-ER-59-60.) And as noted *supra*, the court specifically rejected defendant's argument for a lower fine, reasoning that the maximum fine was necessary to ensure that the fine was punitive and to reflect the appropriate individualized punishment for each defendant. (1-ER-74, 76.)

Lee has shown no error, let alone plain error. Nor has he established any effect on his substantial rights—*i.e.*, that he would have received a lower fine had the court given an even more robust explanation. Lee's fine should be affirmed.

# VI

# CONCLUSION

This Court should affirm defendants' convictions and Lee's sentence.

DATED: May 13, 2024

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

BRAM M. ALDEN
Assistant United States Attorney
Chief, Criminal Appeals Section

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

*/s/ Cassie D. Palmer*

CASSIE D. PALMER
Assistant United States Attorney
Public Corruption & Civil Rights
    Section

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

## STATEMENT OF RELATED CASES

The government states, pursuant to Ninth Circuit Rule 28-2.6, that it is aware of one case related to this appeal: *United States v. Shen Zhen New World I, LLC*, No. 23-972, which arises out the same indictment but a separate trial.

## CERTIFICATE OF COMPLIANCE

I certify that:

1.      This brief complies with the length limits permitted by Ninth Circuit Rule 32-1 because the brief contains 13,992 words, excluding the portions exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016.

DATED: May 13, 2024            */s/ Cassie D. Palmer*

                                               CASSIE D. PALMER
                                               Attorney for Plaintiff-Appellee
                                               UNITED STATES OF AMERICA